**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| METROPOLITAN LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ELINA CHER<br>Defendant. | Civil Action<br><br>No.: ________________________ |

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

Plaintiff, Metropolitan Life Insurance Company ("MetLife"), by and through its undersigned counsel, Cozen O'Connor, files this complaint for damages and declaratory relief against Defendant, Elina Cher ("Cher"), and in support thereof, states the following:

**Introduction**

1. MetLife seeks damages and equitable relief against Cher in connection with Cher's fraudulent procurement of, and subsequent claim for benefits under, disability income insurance policy No. 6515379AH (the "Policy"), which was issued by MetLife to Cher in 2007. A true and correct copy of the Policy, with redactions of personal and medical information, is attached hereto as **Exhibit A**.

2. Cher was required to complete an application (the "Application") and to answer additional questions posed by MetLife during its underwriting of the Policy. A true and correct copy of the Application is appended to the Policy at **Ex. A**.

3. Cher had a duty to provide true and correct responses to the questions posed by MetLife in the Application and throughout the underwriting process generally.

4. Notwithstanding that duty, Cher knowingly, intentionally and repeatedly provided false responses to a myriad of questions posed by MetLife during its underwriting of the Policy.

5. Cher provided false responses for the purpose of obtaining the Policy and, ultimately, receiving benefits under the Policy that would have been unavailable had she provided true and correct information to MetLife.

6. As a result of Cher's pattern and practice of concealing the truth, MetLife was unaware that it had been a target of fraud until years after the Policy was issued.

7. Had MetLife known the truth about Cher's responses during its underwriting process, MetLife would not have issued the Policy or paid benefits to Cher.

8. Notwithstanding the issuance of the Policy, the Policy must be deemed never to have actually taken effect as a result of Cher's fraudulent misrepresentations.

9. There is, therefore, an actual, present and justiciable controversy between the parties for which there is no adequate remedy at law as to whether the Policy is void *ab initio* or, in the alternative, may be rescinded by MetLife.

10. Moreover, MetLife is entitled to an award of damages because it paid benefits under the Policy that would not have been paid but for Cher's fraud.

## Parties

11. MetLife is an insurance company organized and existing under the laws of the State of New York with its principal place of business in New York, New York. MetLife is therefore deemed to be a citizen of the State of New York.

12. Cher is an adult individual residing at 624 Sweetwater Drive, Feasterville, Pennsylvania and is a citizen of the Commonwealth of Pennsylvania.

**Jurisdiction and Venue**

13. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, as the dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

14. Venue is proper in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(1) because the Eastern District of Pennsylvania is the judicial district in which Cher resides.

15. Venue is also proper in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because the Eastern District of Pennsylvania is the judicial district in which a substantial part of the events or omissions giving rise to MetLife's claims against Cher occurred.

**The Application for the Policy**

16. On September 21, 2007, Cher signed and submitted the Application to MetLife. *See* **Ex. A**.

17. The Application posed questions to Cher concerning her personal and family health and medical history, among other issues.

18. Each of the questions posed by MetLife to Cher in the Application was material to MetLife's underwriting of the Policy, meaning MetLife's decision to accept or reject the risk of insuring Cher.

19. Question Five of the Application asked the following:

Have you EVER received treatment, attention or advice for; been told that you had; or had any known indication of:

(a) Any disease or disorder of the heart, arteries or veins; chest pains; elevated (high) blood pressure (hypertension)?

(b) Arthritis; any disease, disorder or deformity of the bones, muscles, tendons, or joints, including the spine; any neck or back problems or disorders, carpal tunnel syndrome?

(c) Any mental, nervous or emotional problem, condition or disorder, including anxiety, depression or stress?

***

(e) Cancer, tumor or polyp?

***

(i) Memory less, loss of concentration, fatigue, neurologic disorder, unconsciousness, loss of cognition, dizziness, paralysis or numbness, impairment of nervous system, epilepsy, or seizures?

***

(k) Any physical deformity or physical impairment?

***

(m) Any disease or disorder of the prostate or testes; uterus, ovaries or breasts?

20. Cher responded “NO” to each of the foregoing sub-questions appearing within Question Five of the Application.

21. Question Six of the Application asked the following:

Have you EVER:

(a) Been advised to have any medical test or surgical operation that was not performed, or had any medical test or surgical operation performed, or gone to a hospital, doctor’s office, clinic, dispensary or sanatorium for observation, examination or treatment; and this information has not been revealed by previous questions?

22. Cher responded “NO” to this question.

23. Cher’s response to each of the foregoing questions and sub-questions appearing within Questions Five and Six of the Application was false when it was made.

24. Cher knew that each of the foregoing responses in the Application was false when it was made.

25. Cher made each of these false responses in the Application for the purpose of inducing MetLife to issue the Policy and, ultimately, receiving benefits thereunder.

### A. Temporary Insurance Agreement

26. The Application papers included a Temporary Insurance Agreement ("TIA") in which Cher made additional representations to MetLife. A true and correct copy of the TIA is appended to the Policy at **Ex. A**.

27. The TIA contained the following disclaimer:

> **Eligibility Requirements for Temporary Insurance –** No benefits will be payable under this Temporary Insurance Agreement if there are incorrect, untrue, incomplete or omitted statements or other material misrepresentations of fact in any part of the application, this Agreement, any supplemental applications or amendments or any questionnaire that becomes a part of the application.

28. The TIA posed the following questions to Cher:

Has the Proposed Insured:

1. In the past 10 years, received treatment or attention from a physician, practitioner or health facility for drug or alcohol abuse, heart trouble, high blood pressure (hypertension), diabetes, stroke, cancer, emotional or mental disorders, or any problem or disorder of the neck or back, or has such treatment ever been advised by a physician or other practitioner?

***

3. Within the past 12 months: (a) seen a physician or other practitioner for diagnosis, care or treatment of any sickness or injury; or (b) had symptoms that would cause an ordinarily prudent person to seek diagnosis, care or treatment?

29. Cher responded "NO" to each of the foregoing questions in the TIA.

30. Cher signed and submitted the TIA to MetLife in support of her Application for the Policy.

31. By signing and submitting the TIA to MetLife, Cher represented to MetLife that:

> I have read this Agreement, and to the best of my knowledge and belief, the answers to all questions are true.

32. In fact, each of the foregoing responses and representations in the TIA was false when it was made.

33. Cher knew that each of the foregoing responses and representations in the TIA was false when it was made.

34. Cher made each of these false responses and representations in the TIA for the purpose of inducing MetLife to issue the Policy and, ultimately, receiving benefits thereunder.

**B. Paramedical/Medical Examination**

35. The Application papers included a Paramedical/Medical Examination ("PME") in which Cher made additional representations to MetLife. A true and correct copy of the PME is appended to the policy at **Ex. A**.

36. Question Five of the PME asked the following:

Have you EVER received treatment, attention or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility that you had:

(a) High blood pressure; chest pain; heart attach; irregular heartbeat; peripheral vascular disease; or any other disease or disorder of the heart or circulatory system (blood vessels)?

***

(c) Seizures; stroke; paralysis; Alzheimer's disease or other form of dementia; multiple sclerosis; memory loss; Parkinson's disease; progressive neurological disorder; headaches; or any other disease or disorder of the brain or nervous system?

***

(e) Any disease or disorder of: the breasts; reproductive organs; or the genitourinary system, including but not limited to: the kidney; bladder; or prostate; or blood, protein or pus in the urine?

***

(g) Arthritis; gout, or disorder of the muscles, bones or joints?

***

(j) Depression; stress: anxiety; or any other psychological or emotional disorder or symptoms?

37. Cher responded "NO" to each of the foregoing sub-questions appearing within Question Five of the PME.

38. Question Thirteen of the PME asked the following:

Has a parent or sibling ever had: heart disease; coronary artery disease; vascular disease; stroke/cerebrovascular disease; diabetes; cancer? (If **Yes**, indicate below.)

39. Cher responded "NO" to Question Thirteen of the PME.

40. Moreover, Cher represented in response to Question Thirteen of the PME that her father and mother were both alive, 67 years old and in good health at the time when the PME was completed.

41. Cher signed and submitted the PME to MetLife in support of her Application for the Policy on October 1, 2007.

42. By signing and submitting the PME, Cher represented to MetLife that:

> I have read the answers to questions 2-14 before signing. They correctly reflect the answers given by me, and are true and complete to the best of my knowledge and belief. There are no exceptions to any such answers other than as written.

43. In fact, each of the foregoing responses and representations in the PME was false when it was made.

44. Cher knew that each of the foregoing responses and representations in the PME was false when it was made.

45. Cher made each of these false responses and representations in the PME for the purpose of inducing MetLife to issue the Policy and, ultimately, receiving benefits thereunder.

### C. Application Amendment

46. The Application papers included an Application Amendment ("Amendment") in which Cher had both an opportunity and duty to revise and correct inaccurate answers in the Application and to provide additional information required by MetLife before the Policy could be delivered or placed in-force. A true and correct copy of the Amendment is appended to the Policy at **Ex. A**.

47. In the Amendment, Cher represented that "The answer to question #2 on page 5 [of the Application] is None."

48. Cher further represented in the Amendment that:

> My 08/2007 physical by Dr. Marina Cherkassky was routine in nature. This physical was not a follow up to nor treatment for any pre-existing condition, nor was this physical prompted by any symptoms, injury, disease or complaints. The results of this physical were normal, with no abnormalities found and no diagnosis made. I was not referred to any other physician nor was I recommended to have any follow up care, testing, surgery, or other procedures. I was not given nor prescribed any medications, nor was I recommended to consider any medications, treatment or follow up care.
>
> I represent I take Tylenol as needed for mild headaches that are very infrequent and I have never been diagnosed with migraines nor have I received medical treatment.

49. Cher signed and submitted the Amendment to MetLife in support of her Application for the Policy on November 2, 2007.

50. By signing and submitting the Amendment, Cher acknowledged and agreed that:

> This application amendment is part of the [Application] referred to above and is subject to the agreements in that [Application]. The [Application] and this amendment are part of the policy/contract to which they are attached.

51. By signing and submitting the Amendment, Cher also represented to MetLife that:

> To the best of my knowledge and belief, the statements and answers in the [Application] as amended by this form are true and complete as of the date this form is signed. There are no facts or circumstances which would require a change in the answers in the [Application], except as shown above.

52. In fact, each of the foregoing responses and representations in the Amendment was false when it was made.

53. Cher knew that each of the foregoing responses and representations in the Amendment was false when it was made.

54. Cher made each of these false responses and representations in the Amendment for the purpose of inducing MetLife to issue the Policy and, ultimately, receiving benefits thereunder.

### D. The Agreement, Signing and Submission of the Application

55. The Application papers included an Agreement section ("Agreement") that immediately preceded the signature section of the Application.

56. The TIA, PME, Amendment and Agreement were each incorporated within the Application for the Policy (referred to collectively as the "Application"), and were attached to and incorporated within the Policy at issuance.

57. Cher made additional representations to MetLife, and agreed to conditions precedent to coverage being placed in-force, in the Agreement section of her Application.

58. Specifically, in the Agreement, Cher represented to MetLife that:

> **I have read this application and any supplemental applications or amendments, and to the best of my knowledge and belief, I agree that:** (a) All statements and answers are true and complete; and (b) All of the information is correctly recorded in the application; and (c) Such written statements may be relied on by MetLife in order to determine if I qualify for issue of a policy.

59. Cher acknowledged in the Agreement that: "I understand that the application seeks full disclosure of the information sought."

60. Cher further acknowledged in the Agreement that: "I understand that this application, any paramedical application, and any supplemental applications or amendments will become a part of any policies issued as a result of this application."

61. Critically, Cher also acknowledged and agreed that:

[T]he policy will not be in effect and MetLife will have no liability until: (a) a policy is delivered in person to me and accepted by me; and (b) the full first premium due is paid. The policy will then be in effect as of its date of issue if at the time it is delivered:

> (a) the condition of my health, the amount of my income, and the status of my employment or occupation are the same as given in the application; and (b) I, the proposed insured, have not received any medical advice or treatment from a physician or other medical practitioner since the date of this application.

If there are any exceptions to (a) or (b), the policy will not be in effect and I will immediately give MetLife details in writing.

62. Thus, Cher expressly acknowledged and agreed that she was required to provide true and correct responses to questions concerning her health in the Application as a precondition to the Policy being placed in-force.

63. Cher never satisfied this precondition because her health was not as stated in the Application when the Policy was delivered.

64. Moreover, Cher did not "give MetLife details in writing" concerning the multitude of fraudulent misrepresentations she made in the Application, or otherwise.

65. Cher was cautioned in the Agreement that:

> **Any person who knowingly, and with intent to defraud an insurance company or other person, submits an application for insurance or files a claim containing any false, incomplete, or misleading information is guilty of insurance fraud, which is a crime.**

66. Notwithstanding this cautionary disclosure, Cher signed and submitted the Application to MetLife on September 21, 2007.

**The Policy**

67. MetLife issued the Policy in reliance on the representations contained in the Application (including the incorporated TIA, PME, Amendment and Agreement).

68. The Policy was backdated at issuance to reflect an issue date of October 15, 2007.

69. As stated, the Application (including the TIA, PME, Amendment and Agreement) was attached to and incorporated within the Policy at issuance, and is deemed to be a part of the Policy. *See* **Ex. A**.

70. Cher paid a total of $27,989.52 in premium over the life of the Policy.

71. By its own terms, the Policy is void as a result of "fraudulent misstatements" made by Cher in the Application.

**The Claim for Benefits**

72. On or about July 20, 2016, Cher gave notice of a claim for benefits under the Policy retroactive to June 15, 2016.

73. In accordance with its legal and contractual rights, MetLife determined that it was necessary and appropriate to obtain Cher's medical records in connection with the claim.

74. On March 15, 2017, during the pendency of MetLife's claim investigation, MetLife conditionally approved Cher's claim retroactive to June 15, 2016 while MetLife continued to marshal and evaluate medical records and other information in support of Cher's claim.

75. MetLife's conditional approval of the claim and payment of benefits was done under full and express reservation of rights, which MetLife explained to Cher in a written communication at the inception of the claim.

76. Later in 2017, upon receiving, reviewing and evaluating all medical records and other information obtained by MetLife in connection with its investigation of Cher's claim, MetLife determined that Cher had misrepresented material facts in the Application.

77. In fact, the misrepresentations were so egregious, numerous and unjustifiable, and revealed such a pattern and practice of deception throughout the entirety of the Application process, that MetLife realized it had, in fact, been a victim of fraud.

78. MetLife asked Cher to provide a written explanation for her misrepresentation in the Application.

79. Notwithstanding that Cher responded to the letter in which MetLife sought an explanation for the misrepresentations in the Application, Cher did not deny that she had, in fact, misrepresented her answers to questions in the Application and did not offer a colorable explanation for those misrepresentations.

80. Though it continued to pay benefits under the Policy under full reservation of rights, MetLife refused to accept additional payments of premium in support of the Policy while it investigated Cher's misrepresentations.

81. Ultimately, when its investigation concluded, MetLife sought to rescind the Policy without the need for litigation.

82. Cher rejected the rescission and, in a classic "blame the victim" response, threatened litigation against MetLife through her counsel. Cher advanced the untenable argument that it was not, in fact, her duty to have provided true and correct information in the

Application but, rather, MetLife's duty to have identified her misrepresentations during its underwriting process and declined to issue coverage.

83. This lawsuit became necessary to determine the rights and obligations of the parties.

**COUNT I – FRAUD**

84. MetLife incorporates the preceding paragraphs of this Complaint as though set forth fully herein.

85. Cher made each of the misrepresentations described in this Complaint notwithstanding a duty to provide true and correct responses to the questions posed by MetLife in the Application.

86. Cher made each of the misrepresentations described in this Complaint with knowledge of its falsity.

87. Cher made each of the misrepresentations described in this Complaint for the purpose of inducing MetLife to issue the Policy and, ultimately, for the additional purpose of receiving benefits under the Policy.

88. As a direct and proximate result of Cher's fraud, MetLife did, in fact, issue the Policy and pay benefits totaling $56,550.00 to Cher under express reservation of rights.

89. Cher knew MetLife would decline to issue the Policy or pay benefits if she provided truthful responses to the questions in the Application.

90. MetLife relied on Cher's responses in the Application when it underwrote the Policy.

91. MetLife had no actual or constructive knowledge of the falsity of Cher's responses to the questions in the Application prior to the conclusion of its investigation of Cher's claim.

92. Cher's misrepresentations were material to the risk assumed by MetLife.

93. MetLife would not have issued the Policy had it known of the falsity of Cher's responses in the Application when it underwrote the Policy.

94. MetLife would not have paid benefits under the Policy had it known of the falsity of Cher's responses in the Application when it underwrote the Policy.

95. Cher's fraud was of such an intentional, repetitive, egregious, wanton and willful nature that it shocks the conscience and justifies an award of punitive damages in addition to compensatory damages.

**COUNT II – DECLARATION THAT THE POLICY IS VOID *AB INITIO***

96. MetLife incorporates the preceding paragraphs of this Complaint as though set forth fully herein.

97. Under the express terms of the Agreement, which was signed by Cher and incorporated into the Policy, the submission of true and correct health information to MetLife in the Application was a condition precedent to the Policy being placed in-force.

98. The aforementioned condition precedent to coverage taking effect was not met because, in fact, Cher failed, by and through her fraudulent plan, to provide true and correct information to MetLife in the Application, as described in this Complaint.

99. The Policy is therefore deemed never to have taken effect and to be void *ab initio*.

100. In the alternative, even if the policy is deemed to have taken effect, the Policy states that MetLife may "void" the policy on account of "fraudulent misstatements made by [Cher] on the Application."

101. Thus, notwithstanding the Policy being deemed to have taken effect, Cher assented to the voiding of the Policy as a remedy for her "fraudulent misstatements" in the Application.

102. The Policy must therefore be treated as though it never took effect and is void *ab initio*.

**COUNT III – DECLARATION THAT METLIFE MAY RESCIND THE POLICY**

103. MetLife incorporates the preceding paragraphs of this Complaint as though set forth fully herein.

104. In the alternative to Count II above, MetLife seeks a declaration that it may exercise the right of rescission in the event the Policy is not declared void *ab initio*.

105. As discussed, Cher made fraudulent misrepresentations in the Application for the Policy.

106. Had MetLife known of the falsity of those representations, MetLife would not have issued the Policy.

107. MetLife is therefore entitled to invoke the equitable remedy of rescission, under which the Policy must be deemed to be null.

WHEREFORE, MetLife respectfully demands the following relief:

1. Actual and compensatory damages in an amount to be determined at trial, plus interest;

2. Punitive damages;

3. Attorney's fees;

4. Costs of litigation;

5. A declaration that the Policy is void *ab initio* or, in the alternative, that the Policy may be rescinded;

6. A declaration that MetLife may retain some or all of the premium paid for the Policy; and

7. Such other relief as the Court deems to be just and proper.

Respectfully submitted,

COZEN O'CONNOR

BY: ______________________

Michael D. Rafalko
Katie S. Rabinowitz
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-4611
(215) 665-4622
mrafalko@cozen.com
krabinowitz@cozen.com
*Attorneys for Defendant,*
*Metropolitan Life Insurance Company*

Dated: October 23, 2018

# EXHIBIT A

MetLife®

Metropolitan Life Insurance Company
200 Park Avenue, New York, New York 10166-0188

Metropolitan Life Insurance Company ("MetLife"), a stock company, will pay the benefits of this policy according to its provisions.

## Disability Income Insurance Policy

* **Guaranteed Renewable to Age 65. Premium Rates are Subject to Change.** This means that You may renew this policy at the end of each term by paying the required Premium by the end of its grace period. The last renewal term will end on the first Premium Due Date on or after Your 65th birthday. We have the right to change the table of Premium rates for this policy on a class basis.

* **Renewal Privilege After Age 65 With Limited Benefit Period. Premium Rates are Subject to Change.** If You are Gainfully Employed for at least 30 hours per week as of the first Premium Due Date on or after Your 65th birthday, or the fifth policy anniversary if later, You may continue coverage under this policy, exclusive of any riders providing additional benefits, for as long as You remain so employed. This privilege is explained on page 9. Coverage is subject to a 2-year Maximum Benefit Period, except that, for Disability starting at age 75 or greater, the Maximum Benefit Period is 1 year.

* The Schedule of Benefits provided by this policy is shown on page 3.

* **Your policy contains an exclusion for Preexisting Conditions. This exclusion may be modified by means of an endorsement to Your policy, which would appear following page 13.**

We have issued this policy to You in consideration of the payment of the Premium and the statements made in Your Application. Your Application is part of Your policy.

Gwenn L. Carr
Senior Vice-President and Secretary

C. Robert Henrikson
Chairman, President and Chief Executive Officer

**10-Day Right to Examine Policy.** Please read this policy. It is a legal contract between You and Us. You may return the policy to Us or to the representative through whom You bought it within 10 days from the date You receive it. If You return it within the 10-day period, the policy will be considered never to have been issued. We will refund any Premium paid.

See Table of Contents on page 4.

Countersigned and delivered on By ____________________

Metropolitan Life Insurance Company

## Policy Schedule

Effective Date: OCTOBER 15, 2007
Insured: ELINA CHER

Policy Number: 6515379 AH
Issue Age and Sex: 45 FEMALE

Monthly Benefit for Total Disability: $4,350
Elimination Period 90 days
Regular Occupation Period: To Age 65
Accumulation Period: 180 days
Maximum Benefit Period: To Age 65 (See Table A in This Schedule)

| Benefit Provisions | | Annual Premium |
|---|---|---|
| Monthly Benefit for Total Disability | | $2,589.56 |
| Residual Disability | IDI2000-PR/RDISA | $683.39 |
| Presumptive Disability | IDIPE03-6 | $0.00 |

IDI2000-P/GR 4A Nonsmoker OMNI ESSENTIAL

Metropolitan Life Insurance Company

## Policy Schedule

Effective Date: OCTOBER 15, 2007 | Policy Number: 6515379 AH
Insured: ELINA CHER | Issue Age and Sex: 45 FEMALE

| | |
|---|---|
| Policy Fee | $60.00 |
| Financial Documentation Adjustment | ($214.38) |
| Total Annual Premium | $3,118.57 |
| Total Premium For Initial Term | $269.13 |
| Monthly IDI Bank Draft | |

Endorsements and Riders to Your policy may change terms (including definitions, conditions, exclusions and limitations of coverage). You should always check each Endorsement and Rider to confirm what coverage You have.

Table A Maximum Benefit Period Varies By Age When Disability Begins

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Before Age 61 | To Age 65 |
| At Age 61, before Age 62 | 48 Months |
| At Age 62, before Age 63 | 42 Months |
| At Age 63, before Age 64 | 36 Months |
| At Age 64, before Age 65 | 30 Months |
| At Age 65, before Age 75 | 24 Months |
| At or after Age 75 | 12 Months |

See Renewal Provision for Ages 65 and Greater
See Policy Wording for Benefits Payable Under Any Riders

IDI2000-P/GR 4A Nonsmoker OMNI ESSENTIAL

# Table of Contents


Renewability........ 1
Schedule of Benefits........ 3
Understanding this Policy........ 5
Definitions........ 5
Benefits........ 8
- Monthly Benefit for Total Disability........ 8
- Limited Monthly Benefit for Mental Disorders and/or Substance Use Disorders. 8
- Waiver of Premiums........ 8
- Disability Because of Transplant Surgery........ 8
- Rehabilitation........ 8

Recurrent and Concurrent Disability........ 9
Renewal Privilege if Employed After Age 65........ 9
- Renewal Privilege........ 9
- Total Disability Benefit With Limited Benefit Period........ 9
- Premiums........ 9

Exclusions........ 10
- General Exclusions........ 10
- Preexisting Conditions Exclusion........ 10

Premium and Reinstatement........ 10
- Premium Payment........ 10
- Grace Period........ 10
- Reinstatement........ 10
- Suspension During Military Service........ 11
- Suspension During Unemployment........ 11

Claims........ 12
- Time of Loss........ 12
- Notice of Claim........ 12
- Claim Forms........ 12
- Proof of Loss........ 12
- Authorizations........ 12
- Examinations........ 12
- Time of Payment of Claim........ 12
- Payment of Claims........ 12
- Beneficiary........ 12
- How to Change the Beneficiary........ 12
- Assignment........ 13

General Provisions........ 13
- The Contract........ 13
- Limitation on Agent's or Broker's or Other Person's Authority........ 13
- Time Limit on Certain Defenses........ 13
- Misstatement of Age and Sex........ 13
- Legal Actions........ 13
- Conformity with State Statutes........ 13
- Waiver of Policy Provisions........ 13


Riders providing additional benefits, special endorsements or exclusion riders, if any, follow page 13.

## Understanding This Policy

To make this policy clear and easy to read, We have left out many cross-references and conditional statements. Therefore, the provisions of the policy must be read as a whole. For example, the Exclusions on page 10 apply to all benefit provisions of this policy.

A policy term and a policy anniversary are measured from the Effective Date of the policy. For example, if the Effective Date is May 5, 2001, the first policy anniversary is May 5, 2002. If the policy term is 6 months, the first term ends November 4, 2001.

Read this policy to find out how to exercise Your rights. Instructions for submitting a claim can be found on page 12. If You want to change an address, or request any administrative action by Us, You should do so on the forms prepared for each purpose. You can get these forms from Your licensed insurance representative or one of Our local offices.

When You Write to Us, please give Us Your name, address and policy number. Please notify Us promptly of any changes. We will Write to You at Your last known address.

Checks, drafts or money orders may be drawn on a U.S. bank to the order of Metropolitan Life (or "MetLife"). They are received subject to the condition that they may be handled for collection in accordance with the practice of the collecting bank or banks. If We do not receive the full amount of any check, draft or money order, it will not constitute payment. All payments are to be made in U.S. currency.

## Definitions

**Accumulation Period** means the number of consecutive days during which the Elimination Period must be satisfied. The Accumulation Period is shown on page 3, and begins on the first day that You are Disabled.

**Age 65** means the first Premium Due Date that occurs on or after Your 65th birthday.

**Age 70** means the first Premium Due Date that occurs on or after Your 70th birthday.

**Application** means the Written application(s) for this policy, including any amendments thereto, and any application(s) for a policy change or reinstatement.

**Complications of Pregnancy** means:

1. Physical conditions which are distinct from pregnancy, but which are caused by pregnancy or adversely affected by pregnancy, and which require medical treatment, prior or subsequent to the termination of pregnancy, such as acute nephritis, nephritis, cardiac decompensation, missed abortion, disease of the endocrine, hemopoietic, nervous or vascular systems, and similar medical and surgical conditions of comparable severity; and
2. Hyperemesis gravidarum and pre-eclampsia requiring Hospital confinement, placenta praevia, ectopic pregnancy which is terminated and spontaneous termination of pregnancy which occurs during a period of gestation in which a viable birth is not possible.

It does not include false labor, occasional spotting, physician prescribed rest during the period of pregnancy, morning sickness and similar conditions associated with the management of a difficult pregnancy not constituting a classifiable distinct complication of pregnancy.

**Disability** or **Disabled** means Total Disability that starts while Your policy is in force.

**Effective Date** means the date that the policy, or a rider, takes effect.

**Elimination Period** means the number of days of Disability which must elapse before benefits become payable for that Disability. These need not be consecutive days of Disability, but must occur within the Accumulation Period for the same or a related cause. No benefits are payable for the Elimination Period. Elimination periods are shown on page 3.

**Gainfully Employed** means actively engaged in an occupation for remuneration or profit.

## Definitions (Continued)

**Hospital** means a licensed institution which:

1. Is operated, under the supervision of Physicians on the premises, for the care and treatment of injuries and sickness;
2. Has medical, surgical and diagnostic facilities;
3. Provides 24-hour nursing services on the premises by registered graduate nurses (RN);
4. Routinely makes a charge for its services; and
5. Is not primarily:
    a. a nursing, convalescent, or rest home;
    b. a place for custodial or educational care; or
    c. a place for the care and treatment of the aged.

**Impairment** means a loss of use or function that can be evaluated by medical means.

**Injury** means an accidental bodily injury that occurs on or after the Effective Date of the policy and while Your policy is in force.

**Maximum Benefit Period** means the longest period of time for which We will pay benefits for any one period of Disability. Maximum Benefit Periods are shown on page 3.

**Mental Disorder and/or Substance Use Disorder** means any and all disorders set forth in the diagnostic categories of the most recently published edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. Examples include, but are not limited to:

1. Depression/dysthymic disorder;
2. Obsessive compulsive disorder;
3. Any psychotic disorder;
4. Panic disorder/agoraphobia;
5. Bipolar disorder/cyclothymic disorder;
6. Anxiety disorder;
7. Diagnosed personality disorder;
8. Anorexia nervosa or bulimia;
9. Alcohol or substance abuse or dependency;
10. Post-traumatic stress disorder; and
11. Somatization disorder.

**Physician** means a person who is:

1. Legally licensed to practice medicine or psychology; or
2. A duly licensed practitioner or therapist operating within the scope of his or her license.

A Physician can not be:

1. You or anyone to whom You are related by blood or marriage;
2. Anyone with whom You share a business interest; or
3. Your employee.

## Definitions (Continued)

**Preexisting Condition** means a Sickness or Injury for which, in the 5 years prior to the Effective Date, medical advice or treatment or care was contemplated, or was recommended by or received from a Physician.

**Premium** is shown on page 3 and is the amount required to keep Your policy in force.

**Premium Due Date** means the first day of each policy term.

**Regular Occupation** means Your usual occupation (or occupations, if more than one) in which You are Gainfully Employed at the time You become Disabled. If You are not Gainfully Employed at the time Your Total Disability begins, Regular Occupation shall then mean any occupation(s) for which You are reasonably fitted by Your education, training or experience.

**Regular Occupation Period** means the period of time as shown on page 3 which starts on the first day following the Elimination Period.

**Sickness** means sickness or disease. However, this policy only covers a Disability arising from a sickness for which medical advice or treatment was first recommended by or received from a Physician after the Effective Date of this policy and while Your policy is in force.

**Signed** means any symbol or method executed or adopted by a person with the present intention to authenticate a record. The signature may be transmitted by paper or electronic media, provided it is consistent with applicable law.

**Total Disability** or **Totally Disabled** means that due solely to Impairment caused by Injury or Sickness, You are:

1. Before the end of the Regular Occupation Period shown on page 3:
   a. Prevented from performing, the material and substantial duties of Your Regular Occupation;
   b. Not Gainfully Employed; and
   c. Receiving appropriate care from a Physician who is appropriate to treat the condition causing the Impairment.
2. After the Regular Occupation Period shown on page 3:
   a. Prevented from performing, any occupation for which You are or become reasonably fitted by Your education, training or experience;
   b. Not Gainfully Employed; and
   c. Receiving appropriate care from a Physician who is appropriate to treat the condition causing the Impairment.

We may waive the requirement of care from a Physician if Your Physician provides documentation acceptable to Us that continued care would be of no benefit to You.

**We, Us** and **Our** mean Metropolitan Life Insurance Company.

**Write, Written** or **Writing** means a record that may be transmitted by paper or electronic media, and that is consistent with applicable law.

**You** and **Your** mean the insured named on page 3.

**Monthly Benefit for Total Disability**

We will pay the Monthly Benefit for Total Disability shown on page 3 while You are Totally Disabled.

This benefit will start to accrue after the Elimination Period. We will pay the benefit while You remain Totally Disabled, but not beyond the Maximum Benefit Period. For periods of less than a month, benefits will be prorated based on a 30-day month.

If You die during a continuous period of Disability, after benefits were paid for 12 months or more, an additional benefit, equal to the amount of the benefit payable for the last month of Disability, will be paid to Your beneficiary for each of the first 3 months after Your death.

**Limited Monthly Benefit for Mental Disorders and/or Substance Use Disorders**

The Maximum Benefit Period is limited to 24 months for all periods of Disability during your lifetime if:

1. Such Disability is due to a Mental Disorder and/or Substance Use Disorder;
2. You otherwise qualify for Disability benefits; and
3. You are not confined in a Hospital.

However, any time during which You are confined in a Hospital does not count towards this 24-month limit.

**Waiver of Premiums**

After the earlier of the date:

1. You have been Disabled for a period of 90 consecutive days; or
2. You satisfy the Elimination Period,

We will waive any Premium that becomes due while You remain Disabled. Your policy and its benefits will continue as if the Premium had been paid.

We will also refund to You any Premium that You paid that became due during the first 90 consecutive days of Disability, or the period during which the Elimination Period was satisfied.

The Premium waived will be based on the frequency of payment in effect on the date Your Disability starts.

If Premiums are being waived, and benefits have been payable for 12 months or more, any Premiums due during the first 90 days after that period of Disability ends will be waived. This additional 90-day waiver of Premium will apply only once during a period of Disability, including Recurrent Disabilities. Thereafter, any Premiums due will be payable. If You do not pay the first Premium due by the end of its grace period, Your policy will end.

Waiver of Premium ends when You are no longer Disabled. When You are no longer eligible for waiver of Premium, You can continue Your policy by paying the next Premium that becomes due.

**Disability Because of Transplant Surgery**

If You are Disabled because You have had surgery, at least 6 months after the Effective Date, to transplant part of Your body to someone else, We will consider You Disabled due to Sickness.

**Rehabilitation**

While You are receiving monthly benefits for Disability, We will consider participating in the cost of an occupational rehabilitation program aimed at helping You to return to Gainful Employment. Such program may include, but is not limited to, an accredited program of professional retraining or recertification. The program may be at Your request or We may suggest it. We will continue to pay benefits to You based on terms that We agree on with You.

In no case will We continue benefits beyond the Maximum Benefit Period.

## Recurrent and Concurrent Disability

**Recurrent Disability**

If, after the end of a period of Disability for which Disability benefits have been paid, You become Disabled again, the later period of Disability will be deemed a Recurrent Disability, which is a continuation of the preceding period of Disability, unless:

1. You have been Gainfully Employed for at least 30 hours per week for at least 12 months following the end of the preceding period of Disability, if the Maximum Benefit Period for the Monthly Benefit for Total Disability is To Age 65 or longer; or
2. You have been Gainfully Employed for at least 30 hours per week for at least 6 months following the end of the preceding period of Disability, if the Maximum Benefit Period for the Monthly Benefit for Total Disability is shorter than To Age 65; or
3. The later period of Disability is due to a different or unrelated cause.

If either 1, 2 or 3 applies, the later period of Disability will be deemed a new period of Disability. A new Elimination Period must be satisfied before benefits start again, and a new Maximum Benefit Period will apply.

If the later period of Disability is deemed a Recurrent Disability, then it is not necessary for You to satisfy a new Elimination Period. However, Disability benefits paid for a Recurrent Disability are considered a continuation of the preceding period of Disability and will be subject to the Maximum Benefit Period that started with the preceding period of Disability. If the Maximum Benefit Period had ended with respect to the preceding period of Disability, no benefits will be payable for a recurrence of that Disability.

**Concurrent Disability**

If a Disability is caused by more than one Injury or Sickness, whether related or unrelated, which overlap for any time during a continuous period of Disability, We will pay benefits as if the Disability were caused by one Injury or Sickness.

## Renewal Privilege if Employed After Age 65-- Total Disability Benefit With Limited Benefit Period

**Renewal Privilege**

Following the first Premium Due Date on or after Your 65th birthday, or the fifth policy anniversary if later, You may continue the coverage under this policy, exclusive of any riders providing additional benefits, as long as:

1. You remain Gainfully Employed for at least 30 hours per week; and
2. The Premium is paid on time.

You may exercise this privilege only while Your policy is in force and You are not Disabled.

We may require proof on each policy anniversary that You have continued to be Gainfully Employed for at least 30 hours per week during the 13 weeks immediately prior to that policy anniversary.

**Total Disability Benefit With Limited Benefit Period**

If You continue coverage under this privilege, benefits will be paid subject to the same provisions, limitations and exclusions in the policy. The Maximum Benefit Period will be 24 months for Total Disability starting before Your 75th birthday. If Total Disability starts after Your 75th birthday, the Maximum Benefit Period will be 12 months.

**Premiums**

The Premium will be based on:

1. Your attained age, and will change on each policy anniversary based on Your attained age; and
2. Your class on the Effective Date of the policy.

We may also change the Premium rate for Your policy as of any policy anniversary, but only if We change it for all policies in Your class.

## Exclusions

**General Exclusions**

We will not pay benefits for a Disability:

1. Due to an act of war, whether declared or undeclared;
2. Due to pregnancy or childbirth, but We will cover Disability due to Complications of Pregnancy;
3. Due to Mental Disorder and/or Substance Use Disorder beyond a 24-month lifetime limitation, except if You are confined in a Hospital;
4. Due to any loss We have excluded by name or specific description;
5. Due to Your committing, or attempting to commit, a felony;
6. Caused by an intentionally self-inflicted Injury.

**Preexisting Conditions Exclusion**

We will not pay benefits for a Disability that starts during the first 3 years after the Effective Date if it was due to a Preexisting Condition. This exclusion does not apply to any condition that was disclosed, and that was not misrepresented, in the Application and was not excluded by name or specific description.

## Premium and Reinstatement

**Premium Payment**

The payment of the Premium shown on page 3, on or before the Effective Date, will keep the policy in force for the term which starts on the Effective Date. At the end of any term while the policy has been in force, You may renew the policy for a further term (called a renewal term). To renew, You must pay, by the end of the policy's grace period, a renewal Premium based on the Premium rates then in effect.

The last renewal term of the policy will end on the day before the first Premium Due Date on or after Your 65th birthday, or the fifth policy anniversary if later. See Renewal Privilege if Employed After Age 65 on page 9 for renewal past this date.

All policy terms will begin at 12:01 A.M. and end at midnight Standard Time, where You live.

You may change the frequency of payment with Our approval.

**Grace Period**

This policy has a 31-day grace period. This means that each Premium after the first may be paid up to 31 days after its due date. During the grace period, the policy will stay in force. If You become Disabled during the grace period while the Premium remains unpaid, We may deduct any unpaid Premium(s) from the benefits due You.

**Reinstatement**

If You do not pay the Premium before the end of the grace period, the policy will lapse. After the policy has lapsed, You may apply for reinstatement by completing an Application and paying all unpaid Premium(s). If We have not sent You a Written disapproval of the reinstatement Application within 45 days, the policy will be reinstated as of the date We received the Premium.

Any Premiums We accept for a reinstatement will be applied to a period for which Premiums have not been paid. The Premium rate for the reinstated policy will reflect any increase in the Premium which would have become effective if the policy had remained in force continuously.

The reinstated policy will cover only a loss that results from an Injury that occurs, or a Sickness for which medical advice or treatment was first recommended by or received from a Physician, after the date of reinstatement. In all other respects You and We will have the same rights under the policy, subject to any provisions noted on or attached to the reinstated policy.

## Premium and Reinstatement (Continued)

**Suspension During Military Service**

If You enter full-time active duty in the military (land, sea or air) service of any nation or international authority, You may suspend this policy. But, You may not suspend the policy during active duty for training lasting 3 months or less. The policy will not be in force while it is suspended, and We will not accept Premiums for that period. Your policy will be suspended as of the date We receive Your Written request to suspend the policy. No privileges or options under this policy or any attached riders may be exercised during suspension. We will refund the pro rata portion of any Premium paid for a period beyond the date We receive your request. Premiums must be paid to the date of suspension.

If Your full-time active duty in the military service ends before the first Premium Due Date on or after Your 65th birthday, You may request that We place this policy back in force without evidence of insurability. Your coverage will start again when we receive:

1. Your Written request to place the policy back in force; and
2. The required pro rata Premium for coverage until the next Premium Due Date.

Your request and Premium payment must be received by Us within 90 days after the date Your active duty in the military service ends. Premiums will be at the same rate that they would have been had Your policy remained in force. The policy will not cover any loss due to an Injury that occurs or a Sickness that first manifests itself while the policy is suspended. In all other respects You and We will have the same rights under the policy as at the time before it was suspended.

**Suspension During Unemployment**

After this policy has been in force for at least one year from the Effective Date, You may suspend this policy if You:

1. Become unemployed; and
2. Receive 8 weeks of governmental unemployment benefits.

The policy will not be in force while it is suspended, and We will not accept Premiums for that period. No privileges or options under this policy or any attached riders may be exercised during suspension.

The suspension will begin when we receive:

1. Your Written request to suspend the policy; and
2. Your certification that you are unemployed and that you have received 8 weeks of governmental unemployment benefits.

We will refund the pro rata portion of any Premium paid for a period beyond the date that the suspension begins. Premiums must be paid to the date of suspension.

After the end of a period of suspension, this policy may not be suspended again until 48 months have elapsed from the end of that period of suspension.

The suspension will end at the earlier of:

1. 6 months after the date of suspension, at which time You will be notified that the policy has been placed back in force and Premiums are now due; or
2. The date We receive Your Written request to end the suspension, subject to evidence satisfactory to Us that You are Gainfully Employed.

You will be required to pay the pro rata Premium for coverage until the next Premium Due Date. If this policy is suspended on the first Premium Due Date on or after Your 65th birthday, this policy will end at that time and cannot be renewed.

Premiums will be at the same rate that they would have been had Your policy remained in force. The policy will not cover any loss due to an Injury that occurs or a Sickness that first manifests itself while the policy is suspended. In all other respects You and We will have the same rights under the policy as at the time before it was suspended.

## Claims

**Time of Loss** All losses must occur while Your policy is in force.

**Notice of Claim** Written notice of claim must be given to Us at Our office within 30 days after a covered loss starts, or as soon thereafter as reasonably possible.

**Claim Forms** After We receive the Written notice of claim We will send You Our proof of loss forms within 15 days. If We do not, You will meet the Written proof of loss requirements if You send Us, within the time set forth below, a Written statement of the nature and extent of Your loss.

**Proof of Loss** Written proof of loss satisfactory to Us must be sent to Us within 90 days after the end of each monthly period for which You claim benefits. Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time. However, such proof must be furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required. As often as is reasonably necessary, We may require as part of the proof of loss financial proof such as personal and business income tax returns, income statements, accountant's statements and other proof acceptable to Us.

We may also require on a monthly basis, that You, and any Physician treating You, complete and Sign supplemental statements of claim.

**Authorizations** We may require, as often as is reasonably necessary, that You provide authorizations for Us to obtain medical information, financial information, and any other information pertinent to Your claim.

**Examinations** At Our expense, as often as is reasonably necessary, We may require You to have an independent examination by a Physician of Our choice.

At Our expense, as often as is reasonably necessary, We may require an audit of all Your business and financial records, by a financial examiner of Our choice. This may include examination of business and financial records for any business in which You have an ownership interest.

At Our expense, as often as is reasonably necessary, We may have Our representatives conduct telephone or in-person interviews with You regarding Your claim.

**Time of Payment of Claim** After We receive Written proof of loss, We will pay the benefits due under the policy. Any balance remaining unpaid upon the termination of liability will be paid immediately upon receipt of due Written proof.

**Payment of Claims** All benefits will be paid to You. But, if You are not legally competent to give a valid release, or if any benefit is payable to Your estate, We may pay up to $10,000 to anyone who We believe is entitled to it. If We make such a payment in good faith, We will not be liable to anyone for the amount We pay.

**Beneficiary** The beneficiary is the person or persons to whom any benefits unpaid at Your death are payable. You may name a contingent beneficiary to become the beneficiary if all the beneficiaries die while You are alive. If no beneficiary or contingent beneficiary is named, or none is alive when You die, Your estate will be the beneficiary. While You are alive, You may change any beneficiary or contingent beneficiary.

If more than one beneficiary is alive when You die, We will pay them in equal shares, unless You have chosen otherwise.

**How to Change The Beneficiary** You may change the beneficiary or contingent beneficiary of this policy by Written notice or assignment of the policy. No change is binding on Us until it is recorded at Our office. Once recorded, the change binds Us as of the date You Signed it. This change will be without prejudice to Us as to any payment We make or action We take before We record the change. We may require that You send Us the policy to make the change.

## Claims (Continued)

**Assignment**

You may assign Your policy or any claim under it by Written assignment. No assignment is binding on Us until it is recorded at Our office. Once recorded, the assignment binds Us as of the date You Signed it. The assignment will be without prejudice to Us as to any payment We make or action We take before We record the assignment. We will not be responsible for the validity of any assignment. We may require that You send Us the policy to record the assignment.

## General Provisions

**The Contract**

This policy with riders, if any, and the Application make up the entire contract. All statements in the Application will be representations and not warranties. No statement will be used to contest the policy unless it appears in the Application.

**Limitation on Agent's or Broker's or Other Person's Authority**

No agent, broker, or other person except Our President, Our Secretary or Vice-President may:

1. Make or change any contract of insurance; or
2. Change or waive any terms of this policy.

Any change or waiver must be in Writing and Signed by Our President, Secretary, or Vice-President.

**Time Limit on Certain Defenses**

After 3 years from the Effective Date of this policy, or of any policy change or reinstatement, no misstatements, except for fraudulent misstatements, made by You on the Application can be used to void this policy or such policy change or reinstatement, or to deny a claim under this policy or the policy change or reinstatement, for a Disability starting after the end of such 3-year period.

No claim for Disability starting after 3 years from the Effective Date of this policy, or of any policy change or reinstatement, will be reduced or denied on the grounds that medical advice or treatment was contemplated, or recommended by or received from a Physician, for a Sickness or physical condition before the Effective Date of this policy, or of such policy change or reinstatement, unless, on the date the Disability starts, that Sickness or physical condition was excluded from coverage by name or specific description.

**Misstatement of Age and Sex**

If Your age or sex is not stated correctly on Our records, the benefits under the policy will be those that the Premium You paid would have bought at Your correct age and sex.

**Legal Actions**

No legal action may be brought until 60 days after Written proof of loss has been provided to Us. No such action may be brought after 3 years from the time Written proof of loss is required to be provided to Us.

**Conformity with State Statutes**

Any provision in this policy which, on the Effective Date, conflicts with the laws of the state in which You reside on that date is amended to meet the minimum requirements of such laws.

**Waiver of Policy Provisions**

Our failure to invoke or enforce a right We have reserved under the terms of this contract may not be deemed a permanent waiver of that right.

Copy of Application is attached.

Metropolitan Life Insurance Company

# Rider: Presumptive Total Disability

This rider is a part of the policy if it is referred to on page 3 of the policy.

**Date of Rider** The Effective Date of this rider is shown on page 3 of the policy.

**Premium** The Premium for this rider is shown on page 3 of the policy.

**Definitions** **Presumptive Total Disability** means that You are presumed to be totally and permanently Disabled if an Injury or Sickness causes Your complete, irrecoverable and irreparable loss of:

1. The use of both hands, or both feet, or one hand and one foot;
2. The sight in both eyes;
3. Speech; or
4. Hearing in both ears.

**Benefits** If You are Totally Disabled according to the definition of Presumptive Total Disability, We will:

1. Consider You to be Totally Disabled even if You are able to work and even if You are not receiving medical care from a Physician; and
2. Waive the Elimination Period, except with respect to any Social Insurance Offset Benefit rider included in Your policy.

Benefits for Presumptive Total Disability will be the Monthly Benefit for Total Disability shown on page 3 of the policy, and will be paid in place of any other Disability benefits. Benefits for Presumptive Total Disability will be payable while You remain Presumptively Totally Disabled, but not beyond the Maximum Benefit Period for this policy shown on page 3 of the policy.

**Time Limit on Certain Defenses** After 3 years from the Effective Date of this rider, no misstatements, except for fraudulent misstatements, made by You on the Application for this rider or the policy to which it is attached can be used to void this rider or deny a claim under this rider for a Total Disability starting more than 3 years from the Effective Date of this rider.

No claim for Total Disability starting after 3 years from the Effective Date of this rider will be reduced or denied on the grounds that medical advice or treatment was contemplated, or recommended by or received from a Physician, for a Sickness or physical condition before the Effective Date of this rider unless, on the date the Total Disability starts, that Sickness or physical condition was excluded from coverage by name or specific description.

**Termination** This rider will end on the earliest of:

1. The date the policy ends;
2. The first Premium Due Date on or after Your 65th birthday, or the fifth policy anniversary, if later; or
3. The date We receive Your Written request to end this benefit, in which case You must return the policy to Us. We will change the policy and return it to You.

Gwenn L. Carr

Gwenn L. Carr
Senior Vice-President and Secretary

Metropolitan Life Insurance Company

# Rider: Monthly Benefit for Residual Disability

This rider is a part of the policy if it is referred to on page 3.

**Effective Date** The Effective Date of this rider is shown on page 3.

**Premium** The Premium for this rider is shown on page 3.

**Definitions** The definition of Disability or Disabled in Your policy is amended to read as follows:

> "**Disability** or **Disabled** means either Total or Residual Disability that starts while Your policy is in force."

**Residual Disability** or **Residually Disabled** means that due solely to Impairment caused by Injury or Sickness:

1. Your Earnings are reduced by at least 20 percent of Your Prior Earnings; and
2. You are receiving appropriate care from a Physician who is appropriate to treat the condition causing the Impairment; and
3. You are not Totally Disabled, and are Gainfully Employed, but You are:
   a. Prevented from performing one or more of the material and substantial duties of Your Regular Occupation; or
   b. Performing the material and substantial duties of Your Regular Occupation, but are not able to perform them for more than 80 percent of the time normally required of You; or
   c. Engaged in another occupation.

We may waive the requirement of care from a Physician if Your Physician provides documentation acceptable to Us that continued care would be of no benefit to You.

**Earnings** means income or compensation, payable as remuneration to You, for actual services You perform, or for goods or services provided by a business in which You have an ownership interest. This term includes salary, fees, profits or losses, commissions, bonuses and other payment for goods or services, which You or Your business render or provide. Earnings are determined after deduction of normal and customary unreimbursed business expenses, but before deduction of any income taxes.

Earnings do not include:

1. Income from dividends, interest, rent, royalties, annuities, or investments; or
2. Income from deferred compensation plans, formal sick pay benefits, disability income policies, or retirement plans.

**Review Date** means each anniversary date of the start of a period of Disability.

**Index Month** means the June before the Review Date. The first Index Month is the June before the start of a period of Disability.

## Rider: Monthly Benefit for Residual Disability (Continued)

**CPI-W** means the Consumer Price Index for Urban Wage Earners and Clerical Workers for all items. It is published by the United States Bureau of Labor Statistics. If the CPI-W cannot be used or is not available, We will choose a suitable index to replace it. CPI-W will then mean the chosen index.

**Prior Earnings** means the greater of Your average monthly Earnings for the 3 calendar years immediately prior to the start of Your Disability, or for the 24 months immediately prior to the start of Your Disability, provided there is financial documentation satisfactory to Us.

After the start of a period of Disability, the Prior Earnings are increased each year, on the Review Date. The Prior Earnings will be multiplied by a factor equal to the CPI-W for the Index Month divided by the CPI-W for the preceding Index Month. The percentage increase in the Prior Earnings in any given year will not be more than 7% or less than 1%.

**Benefits**

**Monthly Benefit for Residual Disability** --While You are Residually Disabled, We will pay a monthly benefit for Residual Disability, if the Elimination Period has been met (by Total Disability and/or Residual Disability).

The monthly amount of this benefit equals:

$$\frac{A-B}{A} \times \text{Monthly Benefit for Total Disability as shown on page 3}$$

"A" is Your Prior Earnings.

"B" is Your Earnings for the month for which Residual Disability is claimed. Such Earnings will not include income received for services You performed prior to the date Your Residual Disability started.

If Earnings for the month for which Residual Disability is claimed are 25 percent or less of Prior Earnings, We will consider "B" to be zero; that is, the full Monthly Benefit for Total Disability, as shown on page 3, will be payable.

For example, if Your Monthly Benefit for Total Disability is $1,000, and Your Prior Earnings are $2,000, and Your monthly Earnings for the month for which Residual Disability is claimed are $800; Your Residual Disability benefit would be computed as follows:

$$\frac{\$2,000-\$800}{\$2,000} \times \$1,000 = \$600$$

For periods of less than a month, benefits will be prorated based on a 30-day month.

During the first 6 months during which Residual Disability benefits are paid, the minimum monthly benefit for Residual Disability will be 50 percent of the Monthly Benefit for Total Disability.

In determining "A" and "B" above, the same accounting method (cash or accrual) must be used. Once chosen, the accounting method (cash or accrual) will be applied consistently to the formula above.

**Cost-of-Living Adjustment for Disability Benefits**—If a Cost-of-Living Adjustment for Disability Benefits (COLA) rider is included in Your policy, then in computing Residual Disability benefits, We will substitute the Adjusted Monthly Benefit for Total Disability, as defined in the COLA rider, for the Monthly Benefit for Total Disability.

The Residual Disability benefit will be payable starting on the day after the Elimination Period ends; however, We will not pay a Residual Disability benefit while We are paying You the Total Disability benefit.

## Rider: Monthly Benefit for Residual Disability (Continued)

We will continue to pay this benefit until the earlier of:

1. The date You are no longer Residually Disabled; or
2. The date the Maximum Benefit Period ends.

**Proof of Earnings**

We may require proof from You, as often as is reasonably necessary, as to Your:

1. Prior Earnings; and
2. Earnings for each month for which a Residual Disability is claimed.

This may include financial proof such as Your personal and business income tax returns, income statements, accountant's statements or other proof acceptable to Us. We may require an audit of all Your business and financial records, by a financial examiner of Our choice. This may include examination of financial records for any business in which You have an ownership interest.

**Time Limit on Certain Defenses**

After 3 years from the Effective Date of this rider, no misstatements, except for fraudulent misstatements, made by You on the Application for this rider or the policy to which it is attached can be used to void this rider or deny a claim under this rider for a Disability starting more than 3 years from the Effective Date of this rider.

No claim for Disability starting after 3 years from the Effective Date of this rider will be reduced or denied on the grounds that medical advice or treatment was contemplated, or recommended by or received from a Physician, for a Sickness or physical condition before the Effective Date of this rider unless, on the date the Disability starts, that Sickness or physical condition was excluded from coverage by name or specific description.

**Termination**

This rider will end on the earliest of:

1. The date the policy ends;
2. The first Premium Due Date on or after Your 65th birthday, or the fifth policy anniversary, if later; or
3. The date We receive Your Written request to end this benefit, in which case You must return the policy to Us. We will change the policy and return it to You.



Gwenn L. Carr
Gwenn L. Carr
Senior Vice-President and Secretary

Metropolitan Life Insurance Company

Name of Insured
CHER, ELINA

Agency
56H
Sales Office
PENNSYLVANIA BUS G

Application Number
707023048
Date of this form
10/15/2007
Policy Number
6515379 AH

To: Metropolitan Life Insurance Company

**Application Amendment**

MetLife
Metropolitan Life Insurance Company
New York, New York, 10010

I amend the application referred to above, as follows

Do Not Alter or Amend This Form

The answer to question #4d on page 1 is [redacted]
The answer to question #4e on page 1 is [redacted]
The answer to question #2 on page 5 is [redacted]
[redacted]

**This application amendment** is part of the application referred to above and is subject to the agreements in that application. The application and this amendment are part of the policy/contract to which they are attached.

To the best of my knowledge and belief, the statements and answers in the application as amended by this form are true and complete as of the date this form is signed. There are no facts or circumstances which would require a change in the answers in the application, except as shown above.

Elina Cher | 11/02/07 | (X) | 11-02-07

Signature of Insured | Date | Signature of Witness | Date

It is important that this signed document be returned to the IDI office within 30 days of receipt. Send to:

**MetLife – Disability Income Unit**
**PO Box 30591**
**Tampa Fl 33630-3591**
**Attention: A/R Control**
**Fax: 813-983-5550**

0843-82-A (0694)

DEABEO

**MetLife**®
Metropolitan Life Insurance Company
One Madison Avenue, New York, NY 10010

1 PA

# Part A. Application for Disability Income Insurance

1. (a) Proposed Insured
ELINA Cher
Full Name First/Given Middle Last/Surname Suffix (e.g. Jr.) Prof. Desig. (Maiden name if applicable)

F [redacted]61
Sex Date of Birth Age (b) State of Birth Ukraine (Country, If other than U.S.)

(c) Are you a United States citizen? ☒ Yes ☐ No If "No," how long have you been a resident of the United States? __ Years __ Months
Status of your visa (if applicable) ☐ Temporary ☐ Permanent

(d) Social Security Number [redacted]

(e) Driver's License Number [redacted] State of Issue PA

(f) Do you read and write English? ☒ Yes ☐ No If No, primary language you read and write ______

2. Residence: 624 Sweetwater Drive
Number Street
Feasterville PA 19053
City State Zip

3. (a) Business Address: P.O. Box 175
Number Street
Feasterville PA 19053
City State Zip

(b) Email Address: ______ Mail correspondence to: ☒ Home ☐ Business

(c) Employer's or Business Name: Data Model Inc. (d) Type of Business: Computer consultant

**Business Owners Only**

(e) What is your percentage of ownership? 100 (f) How long have you been an owner? 10 YR.

(g) How long has the business existed? 10 (h) Number of employees in the business: 1

(i) How is the business organized? ☐ Sole Proprietor ☐ Partnership ☐ C Corporation ☒ S Corporation ☐ PA ☐ PC ☐ LLC ☐ LLP

4. (a) Primary Occupation: Computer Anylyst - program (b) List exact duties and the percentage of time devoted to each duty including amount and type of travel, foreign and domestic:

| | |
|---|---|
| Marketing | 10 % |
| development, assesment | 80 % |
| Stuffing | 10 % |
| | % |

(c) How many employees do you supervise? 1

(d) How long have you been employed in your present occupation? 20

(e) How long have you been employed by your present employer? 10

(f) Are you actively at work at least 30 hours per week in the above occupation? ☒ Yes ☐ No If "No," explain below:

(g) Do you have any other full or part-time jobs? ☐ Yes ☒ No If "Yes," give duties, hours worked and travel required below.

(h) Do you plan to change jobs in the next six months? ☐ Yes ☒ No If "Yes," give details below.

(i) Are you aware of any fact that could change your occupational status or financial stability? ☐ Yes ☒ No
If "Yes," give details below.

DATA ENTRY

OCT 01 2007

2·PA

5. **Base Policy and Optional Benefits Being Applied For:**
☐ Omni Advantage ☐ Omni Select ☒ Omni Essential
Monthly Benefit $ 4350
Benefit Period (years) ☐ 2 ☐ 5 ☒ To Age 65 (N/A in B)
☐ To Age 70 (N/A in A, B)
Elimination Period (days) ☐ 60 ☒ 90 ☐ 180 ☐ 365
☐ 730 (365 & 730 N/A w/ 2 yr Benefit Period)

☐ **Additional Monthly Indemnity (AMI)**
Monthly Benefit $____________
Benefit Period (years) ☐ 2 ☐ 5 ☐ To Age 65 (N/A in B)
☐ To Age 70 (N/A in A, B)
Elimination Period (days) ☐ 60 ☐ 90 ☐ 180 ☐ 365
☐ 730 (365 & 730 N/A w/ 2 yr Benefit Period)

**Disability Income Optional Benefits**
☐ Social Insurance Offset Benefit
Monthly Benefit $____________
Elimination Period (days) ☐ 60 ☐ 90 ☐ 180 ☐ 365
☐ 730 (365 & 730 N/A w/ 2 yr Benefit Period)
☐ Residual with Recovery Benefit (N/A in A, B) ☐ 24 mos. ☐ 36 mos.
☒ Residual without Recovery Benefit (N/A in A, B) Resid
☐ Guaranteed Insurability Option (N/A in A, B)
Option Amount $____________
☐ Good Health Benefit/Refund of Premium
☐ Lifetime (N/A in 3A, 2A, A, B)
☐ Lifetime for AMI (N/A in 3A, 2A, A, B)
☐ Long-Term Care Guaranteed Purchase Option
☐ Your Occupation (N/A in 5AS, 4A, 3A, 2A, A, B) (N/A in Essential)
☐ Transitional Your Occupation (N/A in Essential)
☐ 5 yr (N/A in 3A, 2A, A, B)
☐ 10 yr (N/A in 4A, 3A, 2A, A, B)
☐ To Age 65 (N/A in 4A, 3A, 2A, A, B)
☐ Catastrophic Benefit Monthly Amount $____________
☐ 3% Simple Cost of Living Adjustment with Buy-up
☐ 1-7% Compound Cost of Living Adjustment with Buy-up
☐ Automatic Increase Benefits____________
☐ Other ____________

☐ **Priority Plus Disability Income Insurance (N/A in A, B)**
Monthly Benefit $____________
Benefit Period (years) ☐ 2 ☐ 5 ☐ To Age 65
Elimination Period (days) ☐ 60 ☐ 90 ☐ 180 ☐ 365
☐ 730 (365 & 730 N/A w/ 2 yr Benefit Period)
☐ Residual
Supplemental Monthly Benefit (S.M.B.) Monthly Amount $______
Elimination Period (days) ☐ 60 ☐ 90 ☐ 180
Social Insurance Substitute (S.I.S.) Monthly Amount $________

☐ **Mortgage Comp**
**Fixed Term Disability Income Insurance**
Monthly Benefit $____________
Duration of Policy (years) ☐ 10 ☐ 15 ☐ 20 ☐ 30
**Note: Applicant's Age + Duration Must Not Exceed Age 65**
Elimination Period (days) ☐ 60 ☐ 90 ☐ 180
Mortgage or Loan Date____________
Mortgage or Loan Amount $ ____________
% of Mortgage for which you are responsible ______ %

Name and Address of Mortgagor/Lending Institution:
____________
____________

**Premiums** ☒ Level ☐ **Step Rate**

☐ **Business Overhead Expense Insurance**
(a) Maximum Monthly Benefit for Covered Monthly Expense
$____________
Benefit Period (months) ☐ 12 ☐ 24
Elimination Period (days) ☐ 30 ☐ 60 ☐ 90
☐ Guaranteed Insurability Option Amt. $____________
(b) For a business other than a personal service business, please describe the personal services that you provide to your business without which revenue would be substantially reduced.
____________
____________
____________
____________
(c) Excluding yourself,
(i) How many are employed in the business?____________
(ii) How many of these employees are members of your profession? ______
(iii) How many of these employees are members of your immediate family? ______
(d) List your average monthly business overhead expenses during the past 6 months. If you share monthly business expenses with others, list only your share. Exclude salaries, fees, drawing accounts, profits or any other remuneration for:
(i) you;
(ii) any partners;
(iii) any member of your profession or person performing duties similar to yours; or
(iv) any members of your immediate family

Rent ........................................$ ____________
Taxes (not income taxes) and mortgage interest payments ..........................$ ____________
Other interest on business indebtedness .......$ ____________
Utilities
Electricity ..........................................$ ____________
Telephone ...........................................$ ____________
Maintenance Services ............................$ ____________
Property & Liability Insurance ..................$ ____________
Depreciation of Business Equipment ............$ ____________
Employees' salaries (excluding items in (d) above ......................................$ ____________
Other normal and customary fixed office expenses (specify below) ..........................$ ____________
____________
____________
**Total (of d above)** ..............................$ ____________

3 PA

**6. (a) Mode of Premium Payment:**
☐ Annual ☐ Semi-Annual
☒ Check-O-Matic ☐ Payroll Deduction
(b) Will the entire premium for this policy be paid directly by your employer? ☐ Yes ☒ No
(c) If "Yes" will any portion of this premium be treated as taxable income to you? ☐ Yes ☐ No

**7. Amount paid with Application: $** 269.13 or ☐ None
This amount ☒ is ☐ is not equal to at least one month's premium. No temporary insurance can take effect unless one month's premium is received.

**8. Revocable Beneficiary**

| Full Name | Relationship | Date of Birth |
|---|---|---|
| Michael Chen | son | [redacted]85 |

**9.** Do you have or have available to you through your employer, or are you applying for any other type of:
(a) Individual, Association or Group disability income insurance coverage? ☐ Yes ☒ No
(b) Formal employer sick pay or Union disability income coverage not included in (a)? ☐ Yes ☒ No
(c) Business Overhead Expense or Buy/Sell Disability coverage? ☐ Yes ☒ No
**If "Yes" to question 9a, 9b or 9c, complete the following using the following codes for questions 9 and 10 to indicate "Type": G-Group; A-Association; E-Employer Sick Pay or Union; B-Business Overhead Expense; B/S Buy/Sell**

**Disability Coverage In Force, Applied For or Available Through Your Employer**

| Company or Source | Type | Total Monthly Benefit | Social Insurance Offset | Issue Month/ Year | Elimination Period Accident | Elimination Period Sickness | Benefit Period Accident | Benefit Period Sickness |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**10.** Is coverage being applied for replacing or changing any existing insurance with MetLife or any other insurance company?
☐ Yes ☒ No If "Yes", complete the following:

**Disability Coverage to be Replaced or Changed**

| Insurance Company Name And Address | Policy Number | Monthly Benefit | Type | Issue Month/Year | Termination Month/Year | Premium Mode |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

**11. Financial Information:**

| | Current Year (Annualized) | Last Year | Two Years Ago |
|---|---|---|---|
| **Employee/Salaried Earnings** | [redacted] | | |
| (a) Base Salary (W-2 Income) [redacted] | | | |
| (b) Commissions | | | |
| (c) Bonus, Profit Sharing [redacted] | | | |
| **Owner/Shareholder Earnings** | | | |
| (d) Sole Proprietor net business earnings/losses | | | |
| (e) Partnership/S-Corporation net business earnings/loss [redacted] | | | |
| (f) Net share of corporate earnings/losses | | | |
| **Total Earned Income (Sum of Lines a through f)** | | | |
| **Other Income; Unearned Income** | | | |
| (g) Dividends and Interest | | | |
| (h) Net rental income before depreciation | | | |
| (i) Other (identify source) ______ | | | |

**Financial Information (cont.)**

4 PA

11. **Financial Information (cont.)**

**Current Net Worth**

(j) Does your net worth exceed $3,000,000? [redacted]

(If "Yes" give details below. Amounts expressed to the nearest $100,000 are acceptable)

| | Assets |
|---|---|
| Cash, Savings, Stock & Bonds | $ |
| Personal Property (such as jewelry, furnishings) | $ |
| Personal Residence | $ |
| Other Real Estate | $ |
| Business Interest(s) | $ |
| Other (specify source) ______ | $ |
| Less: Indebtedness | $ |
| Total | $ |

(k) Which tax forms are being submitted with this application? ☒ 1040s and all schedules ☒ W-2s ☐ Other ______

(l) In the past five years have you or any business in which you held at least a 5% interest filed for bankruptcy?
☐ Yes ☒ No If "Yes", give details below, including date of discharge, status and type.

12. (a) Have you: had a driver's license suspended or revoked in the last 3 years; been convicted of 3 or more moving violations; been convicted of driving while impaired or intoxicated? ☐ Yes ☒ No If "Yes", give details below.

(b) Other than above, have you been convicted of any felony or misdemeanor, or do you have any charges pending?
☐ Yes ☒ No If "Yes", give details below.

13. Has any application for a policy of Life, Health or Disability Insurance on you ever been postponed, rated, modified, declined, rescinded or required an extra premium? ☐ Yes ☒ No If "Yes", give details below.

14. (a) Are you required to hold a professional job license? ☐ Yes ☒ No

(b) If "Yes", have you been subject to any disciplinary action, revocation, or suspension of your license, or do you have any charges currently pending against your license? ☐ Yes ☐ No If "Yes", give details below.

15. Have you flown as a pilot, student pilot, or crew member in the last 2 years or do you intend to do so in the next 12 months?
☐ Yes ☒ No If "Yes", complete the Aviation Questionnaire.

16. Have you ever engaged in or do you plan to engage in: Automotive, Motorcycle (including off road use) or Power Boat Racing; Bobsledding; Snowboarding; Skiing; Underwater Cave Exploration; Water Skiing; White Water Rafting; Spelunking; Ballooning; Scuba Diving; Sky Diving; Bungee Jumping; Hang Gliding (including Slope Soaring, Parakiting, Ultralighting, etc.); Mountain Climbing; Parachuting; Snowmobile Racing; Slalom Racing; Rodeo Activities; Karate or Martial Arts?
☐ Yes ☒ No If "Yes", complete the Avocation Questionnaire.

5 PA

## Part B. Statements By the Proposed Insured

1. (a)Height [redacted] (b)Weight [redacted]

2. How much time have you lost from work [redacted] years because of accident or sickness?

3. Date you last used tobacco in any form: Date ________ Type ________ ☒ Never used tobacco

4. (a) Please provide the name, address and phone number of your personal/primary care physician(s) as well as the date and reason for your last consultation. If none, check here ☐

| Name, Address and Phone Number | Date | Reasons for Consultation: Nature, Severity and Frequency of Symptoms; Diagnosis, Treatment and Current Status of Condition |
|---|---|---|
| [redacted] | | |
| | | |

(b) In addition, in the past 5 years has any Chiropractor, Counselor, Health Facility, Physician, Practitioner, Psychiatrist, Psychologist, Social Worker, or Therapist examined or treated you? [redacted]

Give details below for each instance:

(Use Supplementary Information Page, pg. 7 if more space is needed)

| Name, Address and Phone Number of each Chiropractor, Counselor, Health Facility, Physician, Practitioner, Psychiatrist, Psychologist, Social Worker or Therapist | Date | Reasons for Consultation: Nature, Severity and Frequency of Symptoms; Diagnosis, Treatment and Current Status of Condition |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

6 PA

5. **Have you EVER received treatment, attention or advice for; been told that you had; or had any known indication of:**

Yes No

(a) Any disease or disorder of the heart; arteries or veins; chest pains; elevated (high) blood pressure (hyp [redacted]

(b) Arthritis; any disease, disorder or deformity [redacted] muscles, tendons, or joints, including the spine; any neck or back problems or disorders; carpal tunnel [redacted]

(c) Any mental, nervous or emotional problem, condition or disorder, including anxiety, depression or st [redacted]

(d) Stroke, embolism, thrombosis?

(e) Cancer, tumor or polyp?

(f) Diabetes or high blood sugar?

(g) Any disease or disorder of the lungs or respiratory system, including asthma, allergy, emphysema, or Chronic Obstructive Pulmonary Disease? [redacted]

(h) Any disease or disorder of the liver, gall bladder, pancreas, digestive tract, including intestines; ulcer, colitis, hemorrhoids, or hernia? [redacted]

(i) Memory loss, loss of concentration, fatigue, neurologic disorder, unconsciousness, loss of cognition, dizziness, paralysis or numbness, impairment of nervous system, epilepsy, or seizures? [redacted]

(j) Any disease or disorder of the urinary tract or kidney; sugar, albumin or blood in urine? [redacted]

(k) Any physical deformity or physical impairment? [redacted]

(l) Any disease or disorder of glands; anemia, leukemia or other blood disorders? [redacted]

(m) Any disease or disorder of the prostate or te [redacted] ovaries or breasts? [redacted]

(n) Any disease or disorder or impairment of the eyes, ears, mouth, nose or throat; any loss of vision or [redacted]

(o) Endocrine disorders or goiter or disease or d [redacted] thyroid gland? [redacted]

(p) Any sexually transmitted disease, Positive HIV test; Acquired Immune Deficiency Syndrome or other immune deficiency? [redacted]

Yes No

(q) Adult Attention Deficit Disorder, Adult Attention Deficit Hyperactivity Disorder, Alzheimer's Disease, Chronic Fatigue Syndrome, Epstein-Barr Virus, Fibromyalgia, Lyme Disease, Myalgia or Encephalitis? [redacted]

6. **Have you EVER:**

(a) Been advised to have any medical test or surgical operation that was not performed, or had any medical test or surgical operation performed, or gone to a hospital, doctor's office, clinic, dispensary or sanatorium for observation, examination or treatment; and this information [redacted] been revealed by previous questions?

(b) Been advised to modify or restrict eating, dr [redacted] habits because of any health conditions? [redacted]

(c) Had persistent cough, pneumonia, chest discomfort, muscle weakness, unexplained weight loss of 10 pounds or more, swollen glands, patches in the mouth, visual [redacted] recurring diarrhea, fever or infection? [redacted]

7.

(a) Are you currently disabled, or do you expect [redacted]

(b) Have you received or applied for disability, workers' compensation, or military disability benefits [redacted] in the past 5 years? [redacted]

(c) Are you pregnant?
If "Yes," expected delivery date?________________

(d) Within the last five years, have you taken any prescription medications, over the counter herbal medications, or been advised by a physician to take any medications, or are you now taking any prescription medications or [redacted] herbal medications? [redacted]
If "Yes", give name, dosage, dates and reason below.

8. **Have you EVER** used heroin, cocaine, marijuana, barbiturates or other drugs, except as prescribed by a physician or other practitioner; abused alcohol or drugs; or received treatment or advice regarding the use of alcohol or drugs from a physician, other practitioner, or organization which assists those who have an alcohol or [redacted]

9. **For any "Yes" answer to Questions 5 through 8, give details: (Use Supplementary Information Page, pg. 7 if more space is needed)**

| Item No. | Name, Address and Phone Number of each Chiropractor, Counselor, Health Facility, Physician, Practitioner, Psychiatrist, Psychologist, Social Worker or Therapist | Dates | Reason for Consultation; Nature, Severity, and Frequency of Symptoms; Diagnosis, Treatment & Current Status of Condition |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

8 PA

# Agreement

I have read this application and any supplemental applications or amendments, and to the best of my knowledge and belief, I agree that: (a) All statements and answers are true and complete; and (b) All of the information is correctly recorded in the application; and (c) Such written statements may be relied on by MetLife in order to determine if I qualify for issue of a policy.

I understand that the application seeks full disclosure of the information sought; and that no one has the right to alter or exclude or to direct me to alter or exclude any information from the application.

I understand that this application, any paramedical application, and any supplemental applications or amendments will become a part of any policies issued as a result of this application.

Except as set forth in the Temporary Insurance Agreement, the policy will not be in effect and MetLife will have no liability until: (a) a policy is delivered in person to me and is accepted by me; and (b) the full first premium due is paid. The policy will then be in effect as of its date of issue if at the time it is delivered:

> (a) the condition of my health, the amount of my income, and the status of my employment or occupation are the same as given in the application; and (b) I, the proposed insured, have not received any medical advice or treatment from a physician or other medical practitioner since the date of this application.

If there are any exceptions to (a) or (b), the policy will not be in effect and I will immediately give MetLife details in writing.

This policy has a preexisting condition limitation. If a physician has provided or recommended treatment for any sickness or physical condition during the 5 years prior to issuance of the policy for which I am applying, the policy will not provide coverage for that sickness or physical condition during the first 3 years after issue. This limitation will not apply to any condition which is disclosed, and not misrepresented, in this application and is not excluded by name or specific description.

I understand that MetLife will rely on the fact that coverage under any policies listed in Part A, Question 10 on page 3 will end on the Effective Date of Termination shown. If such coverage does not end at that time, any policy issued as a result of this application will be void from the beginning; all premiums will be returned; and no benefits will be payable. MetLife has the right to contact any listed insurer after the Effective Date of Termination to confirm that coverage has ended.

**Any person who knowingly, and with intent to defraud an insurance company or other person, submits an application for insurance or files a claim containing any false, incomplete, or misleading information is guilty of insurance fraud, which is a crime.**

| Witness (Licensed Resident Agent) | Place | Mo. Day Yr. | Signature of Proposed Insured |
|---|---|---|---|
| X [signature] | Phila, PA | 09/21/07 | (X) [signature] |

# Personal History Interview

As part of your application process, MetLife, or someone it designates, will telephone you to verify information in this application, including your occupation, medical history and income. This phone call will take between 15 and 20 minutes to complete. Please indicate below, the best way to reach you.

Home: ____ Day of Week | ____ Date | ____ Time | AM/PM | ( ) ____ Phone

Work: ____ Day of Week | ____ Date | ____ Time | AM/PM | ( ) ____ Phone

Other: ____ Day of Week | ____ Date | ____ Time | AM/PM | ( ) ____ Phone

## CHECK-O-MATIC (C-O-M)

I understand that paying my insurance premiums monthly may result in a higher yearly out-of-pocket cost than a less frequent premium mode.

**Be sure to enclose a voided blank check for the account you wish to use and sign this authorization.**

I authorize: (1) MetLife to initiate monthly deductions from my checking account, by electronic or other means, as payment for the coverage level selected; and (2) the financial institution on which my enclosed sample check (marked VOID) is drawn, to: (a) accept the deductions initiated by MetLife; and (b) give MetLife my most recent address upon MetLife's request. Withdrawals will continue until MetLife has had a reasonable opportunity to act upon my written request to end this service. I authorize deductions to be taken on the effective date of the policy and/on the ____ day of the month, or the next business day.

X [signature] 09/21/07

Signature of Account Holder for Monthly Automatic Deductions — Date

If your check is drawn on a credit union, indicate credit union phone number: (____) ____________

MetLife
Metropolitan Life Insurance Company
New York, New York 10010

# AUTHORIZATION

**In connection with an application for insurance, for underwriting and claim purposes, I authorize:**

- Any medical practitioner or facility or related entity; any insurer; the Medical Information Bureau, Inc. (MIB); any employer; group policyholder, contract holder, or any benefit plan administrator to give Metropolitan Life Insurance Company (the "Company"), or any third party acting on behalf of the Company in this regard:
  - personal information and data about me;
  - medical information, records and data, about me, including information, records and data about drugs prescribed, medical test results and sexually transmitted diseases;
  - information, records and data about me related to alcohol and drug abuse and treatment, including information and data records and data related to alcohol and drug abuse protected by Federal Regulations 42 CFR part 2;
  - information, records and data about me relating to Acquired Immune Deficiency Syndrome (AIDS) or AIDS related conditions including, where permitted by applicable law, Human Immunodeficiency Virus (HIV) test results; and
  - information, records and data about me relating to mental illness, other than psychotherapy notes.
- The Company to redisclose information, records, and data received pursuant to this Authorization about me as authorized by me in writing or as otherwise permitted by applicable law.
- The Company, or any third party acting on behalf of the Company in this regard, to request and obtain consumer, investigative consumer or motor vehicle reports about me.
- Any employer, business associate, financial institution, or government agency to give the Company, or any third party acting on behalf of the Company in this regard, any information or data that it may have about my occupation, avocations, driving record, finances, character, reputation and aviation activities.

**By signing below, I acknowledge my understanding that:**

- All or part of the information, records and data that the Company receives pursuant to this authorization may be disclosed to MIB. Such information may also be disclosed to and used by any reinsurer, employee, affiliate or independent contractor who performs a business service for the Company on the insurance applied for or on existing insurance with the Company, or disclosed as otherwise required or permitted by applicable laws.
- Medical information, records and data that may have been subject to federal and state laws or regulations, including federal rules issued by Health and Human Services, setting forth standards for the use, maintenance and disclosure of such information by health care providers and health plans and records and data related to alcohol and drug abuse protected by Federal Regulations 42 CFR part 2, once disclosed to the Company, may no longer be covered by those laws or regulations.
- Information obtained pursuant to this authorization about me may be used, to the extent permitted by applicable law, to determine the insurability of other family members.
- I may ask to be interviewed if an investigative consumer report is ordered. Please call me at (267) 210-7732, time ______________ if such report is ordered.
- Information relating to HIV test results will only be disclosed as permitted by applicable law.
- This authorization will end 30 months from the date on this form or sooner if prescribed by law. I may revoke it at any time by writing to the Company at ______________________ and advising the Company that I have revoked this Authorization. Revocation may result in rejection of the application or in denial of coverage or a claim for benefits. Any action taken before the Company has received my revocation will be valid.
- I have a right to receive a copy of this form.

**A photocopy of this form is as valid as the original form.**

Signature of Proposed Insured: (X) Elina Cher Date: 09/21/07

Print Name of Proposed Insured: ELINA CHER

IDI2000-APP-AUTH

**MetLife®**
Metropolitan Life Insurance Company
One Madison Avenue, New York, NY 10010

9 PA

Send this copy with application.
Do Not Detach

## RECEIPT AND TEMPORARY INSURANCE AGREEMENT

**Please read both sides of this Agreement carefully. It is important to you. This Agreement provides a maximum of 60 days of Temporary Insurance. The maximum amount of monthly benefits for total disability under this and all other temporary insurance agreements is LIMITED. The maximum period for which benefits may be paid is LIMITED.**

**Eligibility Requirements for Temporary Insurance** – No benefits will be payable under this Temporary Insurance Agreement if there are incorrect, untrue, incomplete or omitted statements or other material misrepresentations of fact in any part of the application, this Agreement, any supplemental applications or amendments or any questionnaire that becomes a part of the application.

In addition, MetLife will grant temporary insurance to the proposed insured only if:

1. At least one month's premium is received on the date of the application;
2. The full amount of any check, draft or money order for such premium is honored on its first presentation for payment;
3. This Agreement is completed at the same time as the application; and
4. All of the following questions are answered and each is answered "No".

Has the Proposed Insured:

1. In the past 10 years, received treatment or attention from a physician, practitioner or health facility for drug or alcohol abuse, heart trouble, high blood pressure (hypertension), diabetes, stroke, cancer, emotional or mental disorders, or any problem or disorder of the neck or back, or has such treatment ever been advised by a physician or other practitioner? [redacted] Yes [redacted] No
2. Within the past 12 months, been to a hospital or other medical facility for diagnosis, care or treatment of any sickness or injury; or had surgery performed or advised? [redacted] Yes [redacted] No
3. Within the past 12 months: (a) seen a physician or other practitioner for diagnosis, care or treatment of any sickness or injury; or (b) had symptoms that would cause an ordinarily prudent person to seek diagnosis, care or treatment? [redacted] Yes [redacted] No
4. Within the past 12 months, applied for, been declined for, or had issued any other disability insurance? [redacted] Yes [redacted] No

I have read this Agreement, and to the best of my knowledge and belief, the answers to all questions are true. I understand and agree to all of the terms of this Agreement. I understand that THIS INSURANCE IS TEMPORARY AND LIMITED. I have received a copy of this Receipt and Agreement.

X ______________________________
Signature of Proposed Insured

No account representative is authorized to accept any payment with the application if any of the above questions are answered "Yes", or left blank.

*(Continued on next page)*

10 PA

*(Continued from previous page)*

**Purpose of Agreement** – This agreement provides LIMITED coverage while we review the Application to decide if we will issue the policy(ies) applied for. This Agreement does not commit us to issue any policy(ies).

**When Temporary Insurance Starts** – Unless a later date is requested in the Application, coverage starts as follows:

1. FOR TOTAL DISABILITY CAUSED BY ACCIDENTAL BODILY INJURY THAT TAKES PLACE ON OR AFTER TEMPORARY INSURANCE COVERAGE STARTS - At the simultaneous completion of the Application and this Agreement.
2. FOR TOTAL DISABILITY CAUSED BY SICKNESS OR DISEASE THAT FIRST MANIFESTS ITSELF AFTER TEMPORARY INSURANCE COVERAGE STARTS – At the later of the simultaneous completion of the Application and this Agreement, or the completion of any medical examination required.

**Temporary Insurance Benefit** – EXCEPT AS LIMITED IN THE NEXT PARAGRAPH OUR LIABILITY IS GOVERNED BY THE TERMS AND CONDITIONS OF THE POLICY(IES) APPLIED FOR. Coverage under this Agreement will be subject to the same terms and conditions as would apply under the policy(ies) applied for.

No matter how much insurance you applied for or how much of an advance payment you made, the following limitations apply to the coverage under this Agreement and all other Agreements issued by Metropolitan for disability income insurance:

1. Benefits are LIMITED TO THE LESSER OF $1,000 per month or the amount of monthly benefit for total disability for which you applied.
2. Benefits will not start UNTIL THE LATER OF the date (a) the elimination period applied for is met, or (b) disability has lasted for 90 days.
3. The period for which payments may be made is LIMITED TO THE SHORTER OF the maximum period applied for or 24 months.

**When Temporary Insurance Ends** – Temporary Insurance will end on the earliest of the following:

1. When coverage starts under a Metropolitan policy.
2. When Metropolitan's first offer to issue a policy is not accepted.
3. 30 days after Metropolitan offers to issue a policy which is on a basis different from that applied for, if SOONER, when you accept or reject any such offer.
4. When Metropolitan offers to refund the amount received.
5. The date Metropolitan mails to the address on the application a notice that it has been declined.
6. 60 days from the date of this Agreement.

If no Metropolitan policy takes effect, the amount received will be refunded when Temporary Insurance ends. Temporary Insurance ends as provided even if we have not yet refunded the advance payment indicated on the reverse side.

**Limitations on Authority** – No one may change or waive the terms of this Agreement.

**NOTICE TO PROPOSED INSURED:**

**You should keep the copy of this Agreement. The original will be kept by Metropolitan. If you do not hear from us about the insurance applied for within 60 days from the date of this**

**Agreement, contact us at:**

**P.O. Box 30591, Tampa, FL 33630**
**Attention: Disability Income - New Business**

13 PA

## Part C. Producer Report and Information

1. How did the sale originate? ☒ Efforts of Writing Representative ☐ Applicant's request ☐ Other ______
2. Modal Premium $ 269.13 Annualized Premium $ 3229.56 Production Credits $ ______
3. Did you call a MetLife office to pre-screen this applicant's eligibility? ☐ Yes ☒ No
4. (a) Was the application completed face to face? ☒ Yes ☐ No. Where? ☒ Residence ☐ Business ☐ Other
   (b) After how many interviews? 1
5. Relationship to Proposed Insured ☒ Not related ☐ Not previously known
6. Have you given the Proposed Insured the detachable Consumer Privacy Notice? ☒ Yes ☐ No
7. (a) In states that require it, have you given the "Outline of Coverage" form to the applicant? ☑ Yes ☐ No: ______
   (b) In states that require it, have you attached a signed acknowledgement of its delivery? ☑ Yes ☐ No: ______
8. Is this Replacement insurance? ☐ Yes ☒ No If Yes, provide reason ______
   If "Yes," in states requiring it, have you given Form 11886AH (or the appropriate state variation) to the applicant and attached the signed copy to this Application? ☐ Yes ☐ No: ______
9. In states requiring it, have you given the "HIV Consent" form to the applicant? ☑ Yes ☐ No: ______
10. State any other MetLife products owned by the proposed insured. ______
11. If Life Insurance is being applied for with MetLife at this time, state which underwriting office. ______
12. Indicate below any other information regarding the Proposed Insured's health, working environment, or financial status not revealed on the application:

I personally saw the Proposed Insured when the application was written and each question was asked of the Proposed Insured and answered as recorded. All answers above and on the application are correct to the best of my knowledge and belief. I certify that any written disclosure statements were given to the applicant no later than the date this application was signed.

Date: 09/21/07 X Signature and Title: [signature] S, R

| Producer | Producer/Representative Name (Please Print) | Office ID# or Location (Please Print) | Producer/ Rep ID # (if applicable, | Social Security Number | Signature | Percent |
|---|---|---|---|---|---|---|
| 1st | | | | | | |
| 2nd | | | | | | |
| 3rd | | | | | | |
| 4th | | | | | | |

## Part D. Sales Manager's Report
### (Person Responsible for Reviewing Business Prior to Submission)

1. This is a bonafide application and to the best of my knowledge the information provided is complete. ☑ Yes ☐ No
2. Was the Producer/Representative licensed to write Personal Health Insurance in the residence state of the applicant on the date the application was signed? ☑ Yes ☐ No

Date: 9/27/07 X Signature and Title: [signature]

14 PA

# Distribution Affiliation (Not for MLFS or NEF)

❑ AXA ❑ BISYS ❑ GEN AM (❑ Direct ❑ Through SBC)
❑ Other Brokerage Submitted Through A Small Business Center

## General Agency Producer Information

| | | | If GA ind |
|---|---|---|---|
| Name: | | Contract # (required for GEN AM GA's): | Sha |
| Address: | | Phone#: | |
| GA Tax ID: | SSN: | Fax #: | |
| Name: | | Contract # (required for GEN AM GA's): | Sha |
| Address: | | Phone#: | |
| GA Tax ID: | SSN: | Fax #: | |
| Name: | | Contract # (required for GEN AM GA's): | Sha |
| Address: | | Phone#: | |
| GA Tax ID: | SSN: | Fax #: | |

## Contact Information

| | |
|---|---|
| Name: | Phone: |
| Fax Number: | E-mail: |

## Writing Producer Information

| SSN/TAX ID | Writing Producer Information | Contact Information | | Sha |
|---|---|---|---|---|
| | Name: | Address: | | |
| | E-mail: | Phone: | Fax: | |
| | Name: | Address: | | |
| | E-mail: | Phone: | Fax: | |
| | Name: | Address: | | |
| | E-mail: | Phone: | Fax: | |
| | Name: | Address: | | |
| | E-mail: | Phone: | Fax: | |
| | Name: | Address: | | |
| | E-mail: | Phone: | Fax: | |

## SBC Sales Office Information

TO BE COMPLETED BY THE SBC OFFICE

| SBC Group/GNA/GRO Rep Name | ID | Share % | SBC IDI Rep Name | ID | Share % | SBC IDI Specialist Name | ID | Sh % |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Is this a ❑ Small-Case ❑ GSI MultiLife case? Yes ❑ No ❑ If Yes, how many lives? ________ Approved Discount ____ %

**PART II** Check the appropriate company. Case/Policy # 207 215739 1

## Paramedical/ Medical Exam

- ☑ Metropolitan Life Insurance Company
- ☐ MetLife Investors Insurance Company
- ☐ New England Life Insurance Company
- ☐ Metropolitan Tower Life Insurance Company
- ☐ MetLife Investors USA Insurance Company
- ☐ General American Life Insurance Company

The Company indicated above is referred to as "the Company."

**The questions below are directed to the person to be examined. Record ONLY this person's answers in the spaces below.**

1. Name of Proposed Insured SHER LELINA Date of Birth [redacted] 1961

2. Tobacco Use – Indicate date last smoked/used: [redacted]

3. Please provide name of doctor, practitioner, or health care facility who can give us the most complete and up to date information concerning your present health. If **None**, check ☐.

Physician Name [redacted]

Street [redacted] State PA Zip 18966

Phone Number [redacted] Number ______ Date Last Consulted [redacted]

Reason [redacted]

Findings, treatment given, medication prescribed. If **None**, check ☐. NONE

Reasons, findings, earlier consultations past 5 years [redacted]

4. Height [redacted] in. Weight [redacted] lbs. Change in weight in past 12 months? [redacted]

If **Yes**, Pounds lost ______ Pounds gained ______ Reason ______

5. Have you EVER received treatment, attention, or advice from any physician, practitioner or health facility for, or been told by any physician, practitioner or health facility that you had:

Details: List question number. Give: dates; duration/ description of condition; diagnosis; treatment; physician, practitioner or health facility names and addresses.

a) High blood pressure; chest pain; heart attack; irregular heartbeat; peripheral vascular disease; or any other disease or disorder of the heart or circulatory system (blood vessels)?

b) Asthma; bronchitis; pneumonia; emphysema; sleep apnea; shortness of breath; or any other disease or disorder of the lungs or respiratory system?

c) Seizures; stroke; paralysis; Alzheimer's disease or other form of dementia; multiple sclerosis; memory loss; Parkinson's disease; progressive neurological disorder; headaches; or any other disease or disorder of the brain or nervous system?

d) Ulcers; colitis; hepatitis; cirrhosis; pancreatitis; or any other disease or disorder of: the liver; pancreas; gallbladder; esophagus; stomach; spleen; or intestines?

e) Any disease or disorder of: the breasts; reproductive organs; or the genitourinary system, including but not limited to: the kidney; bladder; or prostate; or blood, protein or pus in the urine?

f) Diabetes; thyroid disorder; elevated cholesterol or other lipid disorder; or any other endocrine disease or disorder?

g) Arthritis; gout; osteoporosis; or other disease or disorder of the: muscles; bones; spine (discs, back, neck); or joints?

h) Cancer; tumor; polyp; or cyst? Any disease or disorder of the skin?

i) Anemia; leukemia; or any other disease or disorder of the blood or lymph glands?

j) Depression; stress; anxiety; or any other psychological or emotional disorder or symptoms?

k) Any disease or disorder of the eyes, ears, nose, or throat?

[redacted]



SF

2

6. Are you now, or within the past year, taking medication or receiving treatment? (Including over the counter medications, vitamins, herbal supplements, alternative therapies, etc.)

7. Do you have any doctor's visits, medical tests, medical care, or surgery scheduled for the next six months?

8. Other than the above, during the past five years have you had any:

a) Checkup; consultations; electrocardiogram; chest x-ray; or other medical test?

b) Illness; injury; or health condition not revealed above; or have been recommended to have any: treatment; hospitalization; surgery; medical test; or medication?

9. Have you:

a) ever been diagnosed or treated by a member of the medical profession for Acquired Immune Deficiency Syndrome (AIDS)?

b) ever tested positive for the AIDS Human Immunodeficiency Virus (HIV) virus or for antibodies to the AIDS (HIV) virus?

10. a) Have you ever used heroin, cocaine, barbiturates, or other drugs, except as prescribed by a physician or other licensed practitioner?

b) Have you ever received treatment from a physician, practitioner, health facility or counselor regarding the use of alcohol, or the use of drugs; or been advised by a physician, practitioner, health facility or counselor to restrict the use of alcohol or drugs; or received treatment or advice from an organization that assists those who have an alcohol or drug problem?

[redacted]

11. Do you exercise? ☑ Yes ☐ No Type CARDIO, WEIGHTS How often? TWICE OR 3 X A WK.

12. Are you now pregnant? ☐ Yes ☑ No If Yes, estimated date of delivery? ______

13. Has a parent or sibling ever had: heart disease; coronary artery disease; vascular disease; stroke/cerebrovascular disease; diabetes; cancer? (If Yes, indicate below.) ☐ Yes ☑ No

| Relationship to Proposed Insured: | Age(s) if living | Age(s) at Death | State of Health (Specific Conditions) or Cause of Death Attach additional sheet(s) if necessary. |
|---|---|---|---|
| FATHER | 67 | | GOOD |
| MOTHER | 67 | | GOOD |
| — | | | |

14. a) Do you currently use any assisted devices such as: a walker; wheelchair; long leg braces; cane; or crutches?

b) Do you need any assistance or supervision with any or all of the following activities: eating; bathing; dressing; walking; moving in/out of a chair or bed; toileting; continence or taking medication?

If Yes, provide details above.

[redacted]

I have read the answers to questions 2-14 before signing. They correctly reflect the answers given by me, and are true and complete to the best of my knowledge and belief. There are no exceptions to any such answers other than as written.

Signature of Proposed Insured Elina Chen Date 10/1/07

Witness to Signature Layna Schaaf MT City and State FEASTERVILLE, PA

EMED-13-05 (12/05) eF

Case/Policy # 207-215-739 3

## Report of Paramedical/Medical Examiner

### Section 1 Complete for All Exams

1. Name of person examined ELINA - CHER Date/Time of exam 10-1-07 10 AM
2. Sex: M ☐ F ☑ If female, was Proposed Insured menstruating on date of this examination? [redacted]
3. Height (in shoes) [redacted] Weight (clothed) [redacted]
   Chest (full inspirati[redacted] Chest (forced[redacted] Abdomen (at umbilicus) [redacted]
   Did you measure? [redacted] Did you weigh? [redacted]
4. Blood Pressure: Sitting Systolic/Diastolic – 5th phase [redacted]
   If systolic over 140 or diastolic over 90, repeat later in exam [redacted]
5. Pulse At Rest: Rate (per min.) [redacted]
6. Is appearance unhealthy or old[redacted]
7. Urinalysis: Protein: [redacted]
   Is blood also being sent to lab? [redacted]

0072634752 analysis

### Section 2 Complete for Physician Exam Only

Details for answers to questions 8-12:

8. Heart: Is there any: a) Enlargement? ☐ Yes ☐ No c) Dyspnea? ☐ Yes ☐ No
   b) Murmur(s)? (If Yes, complete below) ☐ Yes ☐ No d) Edema? ☐ Yes ☐ No

| | Murmur 1 | Murmur 2 |
|---|---|---|
| Location (Apical, Aortic, Pulmonic, Parasternal) | | |
| Timing (Systolic, Presystolic, Diastolic) | | |
| Quality (Coarse, Blowing, Rumbling, Musical) | | |
| Loudness (Grade 1-6) | | |
| Constant (Yes or No) | | |
| Transmitted (Yes or No) | | |
| After Exercise (Increased, Absent, Unchanged, Decreased) | | |

PARAMED

Indicate:
Apex by: X
Murmur area by: ☐
Point of greatest intensity by: O
Transmission by: →



9. Is there on examination any abnormality of the following?
   a) Eyes, ears, nose, mouth, pharynx? (If vision or hearing markedly impaired, indicate degree and correction.)
   b) Skin (include scars); lymph nodes; varicose veins or peripheral arteries?
   c) Nervous system (include reflexes, gait, and paralysis)?
   d) Respiratory system?
   e) Abdomen (describe scars, liver enlargement)?
   f) Genitourinary system?
   g) Endocrine system (include thyroid)?
   h) Musculoskeletal system (include spine, joints, amputations, and deformities)?
10. Are there any hernias?
11. Are you aware of additional medical history?
12. Are you the personal physician of the applicant?

[redacted]

13. Please provide your overall clinical impression of Proposed Insured:

## Section 3 Complete for Proposed Insureds Age 70 and Over

1. Ask the Proposed Insured if he/she:
   a) Has a history of falls within the last year. ☐ Yes ☐ No
   If **Yes**, provide details of all falls (including how many, dates, reason, and treatment).

   b) Lives with another person. ☐ Yes ☐ No
   If **Yes**, relationship to Proposed Insured?
   How often do you visit with family/friends?
   Lives in an assisted living facility or other facility with services on site? ☐ Yes ☐ No

   c) Drives. ☐ Yes ☐ No
   If **Yes**, does the Proposed Insured have a handicap license plate or sticker? ☐ Yes ☐ No
   If **No**, when and why did the Proposed Insured stop?

   d) Works, volunteers, travels, and/or has hobbies. ☐ Yes ☐ No
   If **Yes**, provide details (including type of activity and how often).

   e) Needs assistance with any or all of the following activities: (Check only those that apply:) ☐ Yes ☐ No
   ☐ Cooking/Meal Preparation ☐ House Cleaning ☐ Laundry
   ☐ Shopping ☐ Handling Finances ☐ Using the Telephone
   If **Yes**, provide details.

2. Point to three objects and ask the Proposed Insured to tell you what they are and indicate that you are going to ask them to recall these later. Record the three objects exactly as the Proposed Insured states them.

3. Ask the Proposed Insured to stand up, walk at least 10 feet, turn around, walk back, and sit down in the same place. Observe and record the performance (Comment on speed and steadiness; note any hesitancy, limping, unsteadiness, etc.).

4. Please have the Proposed Insured draw a clock reading 11:10. →
   If more space is required for the drawing, please attach a separate page.

5. Now ask the Proposed Insured to remember the three objects from earlier. Ask him/her to restate them. Please record his/her exact response here.

### EXAMINER'S ASSESSMENT

1. If exam was conducted in the home, describe the Proposed Insured's living situation and possible safety issues: home – with stairs; home – one level; clean appearance; loose carpeting; untidy/disrepair; cluttered hallways/sidewalks; etc.

2. Describe the Proposed Insured's appearance: average build; well groomed; appears healthy; slender build; poorly groomed; appears fragile; obese; poor dentition; etc.

## Section 4 Complete for All Exams

Place of exam: ☐ Examiner's Office ☑ Proposed Insured's Residence ☐ Proposed Insured's Business ☐ Other
City/State FEASTERVILLE, PA
Agent/Broker A. SLESKY 36491 Branch/District# or Agency Name 56H GR. PHL
Signature of Paramedical/Physician Examiner [signature]
Printed Name of Exam[redacted] TIN of Examiner
Address of Examiner [redacted] Vendor Name
PA 19072
Was the exam conducted with a translator? ☐ Yes ☑ No
If **Yes**, what is the translator's relationship to the Proposed Insured?

JS 44 (Rev. 06/17)

MAK

# CIVIL COVER SHEET

2:18-4588

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Metropolitan Life Insurance Company

**(b)** County of Residence of First Listed Plaintiff ______
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Michael D. Rafalko, Katie S. Rabinowitz
Cozen O'Connor
1650 Market St., Ste. 2800, Philadelphia PA 19103

**DEFENDANTS**
Elina Cher

18 4588

County of Residence of First Listed Defendant Bucks County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
David P. Temple
Gallagher Law, P.C.
1600 Market Street, Ste. 1320, Philadelphia, PA 19103

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☒ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation - Transfer ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Insurance fraud

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. **DEMAND $** ______
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):* JUDGE ______ DOCKET NUMBER ______

OCT 23 2018

DATE 10/23/18 SIGNATURE OF ATTORNEY OF RECORD [signature]

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

MAK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

18 4588

## DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: Metropolitan Life Insurance Company, 200 Park Avenue, New York, NY 10166

Address of Defendant: 624 Sweetwater Drive, Feasterville, Pennsylvania

Place of Accident, Incident or Transaction: Feasterville, Pennsylvania

***RELATED CASE, IF ANY:***

Case Number: ______ Judge: ______ Date Terminated: ______

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? Yes ☐ No ☑
2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? Yes ☐ No ☑
3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? Yes ☐ No ☑
4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? Yes ☐ No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE 10/23/18 [signature] 323617
*Attorney-at-Law / Pro Se Plaintiff* *Attorney I.D. # (if applicable)*

**CIVIL: (Place a √ in one category only)**

***A. Federal Question Cases:***

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
*(Please specify)* ______

***B. Diversity Jurisdiction Cases:***

☑ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify)* ______
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
*(Please specify)* ______

**ARBITRATION CERTIFICATION**

*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Katie S. Rabinowitz, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

OCT 23 2018

DATE 10/23/18 [signature] 323617
*Attorney-at-Law / Pro Se Plaintiff* *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

MAK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Metropolitan Life Insurance Company | : | CIVIL ACTION |
| v. | : | |
| Elina Cher | : | NO. 18 4588 |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (X)

| | | |
|---|---|---|
| October 23,2018 | Katie S. Rabinowitz | Metropolitan Life Insurance Company |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-665-4622 | 215-701-2063 | krabinowitz@cozen.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

OCT 23 2018